174

UNITED STATES of America, Appellee,

v.

Walter R. WEBSTER, a/k/a Gangster,
a/k/a Mr. G, Appellant.

UNITED STATES of America, Appellee,

v.

Walter R. WEBSTER, a/k/a Gangster;
a/k/a Mr. G.; a/k/a G, Appellant.

UNITED STATES of America, Appellee,

v.

Richard ADAMS, a/k/a Mr.
Richard, Appellant.

UNITED STATES of America, Appellee,

v.

Norma THOMPSON, Appellant.

UNITED STATES of America, Appellee,

v.

Boysie ASH, Appellant.

UNITED STATES of America, Appellee,

v.

Victoria WILLS, Appellant.

UNITED STATES of America, Appellee,

v.

John V. CHRISTIAN, a/k/a
Wolf, Appellant.

UNITED STATES of America, Appellee,

v.

Herbert Leon JOHNSON, a/k/a
Herb, Appellant.

Nos. 79–5204 and 79–5240 to 79–5246.

United States Court of Appeals,
Fourth Circuit.

Argued July 7, 1980.

Decided Jan. 15, 1981.

Kenneth L. Thompson, New York City (George L. Russell, Jr., Baltimore, Md., on brief), for appellant Adams.

Benjamin Lipsitz, Baltimore, Md., for appellant Johnson.

Harold I. Glaser, Baltimore, Md. (Lawrence A. Arch, Baltimore, Md., on brief), for appellants Webster and Thompson.

Howard L. Cardin, Baltimore, Md., on brief, for appellant Ash.

Mark Lee Phillips, Kensington, Md., on brief, for appellant Wills.

Stanley H. Miller, Baltimore, Md., on brief, for appellant Christian.

Glenn L. Cook, Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., on brief), for appellee United States.

Before WINTER, BUTZNER and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Appellants seek to overturn their convictions on a wide variety of charges related to a conspiracy to distribute illegal drugs. Of the many issues raised on appeal, the only ones requiring substantial discussion concern (a) the legality of certain wiretaps, (b) the constitutionality of part of 21 U.S.C. § 848, the so-called "Kingpin" statute, (c) the proper construction of 18 U.S.C. § 1962(c) (part of the Racketeer Influenced and Corrupt Organizations ("RICO") statute), (d) the propriety of the district court's refusal to admit polygraph evidence in a related nonjury trial of defendant Webster, and (e) the sufficiency of the evidence to convict appellants.

## I.

Substantially all of the evidence in the trial consisted of either the contents or the fruits of wiretaps which were placed on telephones pursuant to *ex parte* orders issued on May 10, June 9, and June 21, 1978, by a judge of the Supreme Bench of Baltimore City. Defendants attack the statute under which the orders were issued, the sufficiency of the applications for the orders, and the propriety of playing tapes of the intercepted calls to undercover informants who were cooperating with law enforcement officers.

### A. The Validity of the Maryland Statute

Defendants spent substantial portions of their brief and argument attacking the validity of the Maryland statute under which, defendants stated, the order allowing the taps had been issued. According to defendants, that statute remained in effect through June 30, 1978, and deviated so much from the provisions of 18 U.S.C. §§ 2510–2520 (1976) that federal law barred the use as evidence of information obtained under the authority of the Maryland Act. *See* 18 U.S.C. § 2515 (1976); J. Carr, *The Law of Electronic Surveillance* 31–32 (1977). At argument, strangely enough, the United States attempted to support the challenged Maryland statute, although in its Brief the government had correctly

pointed out that the statute which defendants were attacking had been replaced, effective July 1, 1977, with a statute which tracks the federal statute practically verbatim. *See* Md.Cts. & Jud.Proc.Code Ann. §§ 10–401 to –412 (1980). Since none of the wiretaps in this case had been ordered prior to May 10, 1978, defendant's federal constitutional attack on the Maryland law (as well as on any claimed nonfulfillment of the requirement of compliance with the federal wiretap statute) represents no more than misdirected effort.

### B. Sufficiency of the Applications for the Taps and the Accompanying Affidavits

Both the federal and the Maryland wire interception statutes require an issuing judge to determine, on the basis of the application for the wiretap, that probable cause exists to believe that (1) an individual is committing, has committed, or is about to commit one of several offenses enumerated in Md.Cts. & Jud.Proc.Code Ann. § 10–406 or 18 U.S.C. § 2516 (1976) (both of which include dealing in narcotics), (2) particular communications concerning that offense will be intercepted by the wiretap, and (3) the target facilities will be used in connection with the offense. In addition, each statute requires (4) a showing either that normal investigative procedures were unsuccessful or reasonably appear to be unlikely to succeed if tried or to be too dangerous. *See* Md.Cts. & Jud.Proc.Code Ann. § 10–408(c)(1)–(4) (1980); 18 U.S.C. § 2518(3)(a)–(d) (1976). The defendants challenge the sufficiency of the applications for the wiretaps in each of these respects. As Judge Young's Order denying the Motion to Suppress is thorough and well reasoned, our discussion can be substantially abbreviated.

1. Probable cause to believe that the targets had committed or were committing or about to commit certain offenses.

The affidavits on which the May 10, 1978 surveillance order was based are almost textbook examples of how to conform to

the constitutional requirements articulated in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and in *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The expertise and credibility of both the affiants and the three informants are established in great detail, and the actual observations of the affiants and the informers are reported in even greater detail, enabling the neutral magistrate to form his or her own conclusions regarding the existence *vel non* of probable cause.

For instance, one target of the May 10, 1978 wiretap was heard taking the orders for drugs, another was seen exchanging cocaine for stolen goods, a third was heard offering to sell cocaine and describing the large amounts he buys and sells, and a fourth was seen distributing cocaine. There were, therefore, ample grounds for the judge to have found probable cause that certain individuals had committed or were committing certain crimes. *See* Md.Cts. & Jud.Proc.Code Ann. § 10–408(c)(1) (1980); 18 U.S.C. § 2518(3)(a) (1976).

2. Probable cause with respect to the target phones.

■ There was also probable cause to believe that the target telephones had been used in connection with the commission of the relevant offenses. For example, informants reported drug related conversations that had occurred on the Springdale Avenue telephone and on the West Baltimore Street telephone.

Defendants claim that, even conceding that the telephones had been used in connection with the offenses, there was insufficient grounds for probable cause to believe at the time of the surveillance order that the target phones were being used or were about to be used in connection with the offenses. Defendants base this contention on two grounds. First, they assert that the substantial period of time which had elapsed between the actual observations regarding the target telephones and the sub-sequent request for the surveillance order removed the basis for believing narcotics sales continued. Second, defendants argue that the statements in the affidavit that the target individuals had begun to be suspicious that they were being observed by the police and had begun a variety of precautions served notice to the issuing tribunal that criminal activity "might have been" halted by the time the warrant was issued. Neither argument is valid.

We agree that otherwise reliable information which has become stale cannot provide the sole basis for a finding of probable cause. *See United States v. Harris*, 482 F.2d 1115, 1119 (3d Cir. 1973). However, the affidavit described numerous instances of both recent and continuing use of the target telephones to conduct illegal drug transactions. For instance, less than a month before the wiretap application, one informant reported overhearing two narcotics-related conversations originating from a target telephone. If the informant's observation had provided the single isolated basis of probable cause, perhaps then we would be called upon to determine whether such a showing complied with the staleness standard. However, the extensive drug business described in the affidavit indicated a continuing enterprise. Moreover, subsequent investigation conducted prior to the wiretap application provided additional confirmation that the target phones were used to conduct illegal drug business. For instance, long distance records subpoenaed from the telephone company and matched with Drug Enforcement Administration records containing telephone numbers of known or suspected drug traffickers resulted in three "hits." Where an affidavit "properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant." *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972). Therefore, neither the lapse of time nor the conceded suspicion of the target individuals was sufficient for the probability of continued inculpatory use of the phones to fall

below the level required for probable cause.[1]

■ The facts presented in the affidavit provided sufficient grounds for the judge to have found probable cause both that the sought-after communications would be obtained through the interception and that the target phones were facilities which were being and were about to be used in connection with the commission of narcotics offenses. *See* Md.Cts. & Jud.Proc.Code Ann. § 10–408(c)(2), (4) (1980); 18 U.S.C. § 2518(3)(b), (d) (1976). Assuming that the goal of the surveillance was to seek evidence regarding higher-ups in the drug distribution network, there is no basis for concluding that (as defendants argue) the judge issuing the order must find that there is probable cause to believe that the target phones will be used to talk *to* the higher-ups. Both statutory and constitutional requirements are satisfied if the issuing judge finds that there was probable cause to believe that the target phones would be used to talk *about* those higher-ups. In fact, the affidavit contains ample grounds to believe that the phones would be used to talk both to and about those as yet unknown targets.

3. Sufficiency of the showing of exhaustion of alternative investigative techniques.

Defendants assert that the applicants for the wiretap orders failed adequately to show that alternative techniques of investigation had been tried and had failed or reasonably appeared to be unlikely to succeed if tried or to be too dangerous. Defendants stress as particularly promising but untried techniques: grand jury subpoenas and the threat of contempt against the informants, the threat of prosecution and the offer of immunity, infiltration by government agents, and physical searches of the "stash" houses pursuant to a warrant.

At the time of the wiretap application, conventional investigative techinques such as the use of informants had been attempted but had failed to provide significant information regarding the distributors' sources for the drugs. Moreover, the informants had refused to testify in court. Although the investigation had proceeded for months, surveillance had failed to expose the sources for the illicit traffic. The defendants' suggested techniques are by their nature speculative. There is nothing to negative the conclusion that normal investigative procedures reasonably appeared to be unlikely to succeed. Moreover, if those techinques had been tried and had failed, the as yet unidentified "higher-ups" targeted by the investigation would have been so alerted to law enforcement interest in their activities that the usefulness of any subsequent electronic surveillance would have been greatly diminished or destroyed.

4. The legality of the subpoenas served on the telephone company.

■ The applications for the taps relied in part on data obtained from the telephone company pursuant to subpoenas issued by the Maryland State's Attorney. Defendants claim that such subpoenas, rather than grand jury subpoenas, may be used under state law only when the investigation is to be prosecuted by means of an information, rather than an indictment,[2] and that such a mode of prosecution was exceedingly unlikely given the seriousness of the offenses involved in a narcotics investigation. De-

---

1. Counsel for the defendants quote the following sentence from the affidavit: "The persons involved would not make use of the [target] telephones ... to conduct narcotics transactions." Relying on that sentence, defendants' counsel then urge that the court could not properly find probable cause that the target phones were being or were about to be used in connection with the commission of drug related crimes. What the affidavit states instead, however, is that there was a necessity not to give advance or contemporaneous notice of the electronic surveillance to the individuals about to be surveilled because, then, in that case the target phones would not be used in connection with any drug transactions.

2. Md.Ann.Code Art. 27, § 592A(a) (Supp.1979) provides in part: "The State's attorney may issue a summons for a witness for the purpose of obtaining evidence to prepare an information."

fendants, therefore, urge suppression of the fruits of the wiretaps, which were the fruits of the assertedly invalid subpoenas to the telephone company.

The difficulty with defendants' position is that it forces prosecutors to decide far too early in an investigation whether they will proceed by information rather than by indictment. During the early stages of an investigation, a State's Attorney may very well have intended to proceed by way of information, only to determine later that grand jury indictments were necessary. In such a situation we would be loath to foreclose prosecutors from utilizing documents subpoenaed under their statutory authority, at least where, as here, no purposeful abuse of the subpoena power has been shown.

5. The June 9 extension of the May 10 wiretap authorization.

■ Defendants contend that the June 9, 1978, extension of the May 10, 1978, wiretap order was flawed because, at the time of extension, the wiretap had already gathered evidence sufficient to demonstrate the existence of a conspiracy to violate narcotics laws. Thus, they claim, the purposes of the original order having been fulfilled, the extension was invalid. The point is frivolous. Nothing in the state wiretap statute prevents the use of a wiretap to obtain evidence regarding coconspirators whose existence is known or suspected and probable but whose identity is not known. The original wiretap order indicated that the tap was designed in part to gain evidence concerning such unidentified coconspirators, and the affidavit accompanying the application for an extension indicated that the goal had not yet been reached.

6. Suppression of the June orders as fruits of the initial wiretapping.

Defendants contend that if the May 10, 1978, order was invalid, then the results of the wiretapping pursuant to the two June orders would have been tainted also as the fruits of the original invalid order. Since the May order was in fact valid, the premise fail and, therefore, so does defendants' conclusion.

## II.

■ Defendants contend that, as compared with the population of persons eligible to be jurors in the District of Maryland, black persons were underrepresented on the jury that tried the defendants because black persons are inadequately represented in the jury wheel. Any objection to the composition of the jury was waived, however, because defendants first sought to raise it at a time subsequent both to the beginning of the voir dire examination and to a point seven days after they could have discovered the grounds for the challenge by the exercise of due diligence. *See* 28 U.S.C. § 1867(a) (Supp.1980); *United States v. Canty*, 422 F.2d 358, 360 (4th Cir. 1970) (per curiam), *cert. denied*, 409 U.S. 987, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972). We therefore need not decide either whether defendants have made out a *prima facie* case of underrepresentation, *see Castaneda v. Partida*, 430 U.S. 482, 496 n.17, 97 S.Ct. 1272, 1281 n.17, 51 L.Ed.2d 498 (1977), or (if a *prima facie* case was made out) whether use of voting rolls as a source of names for the jury wheel rebuts the *prima facie* case, even if blacks are known to be inadequately represented on the voting rolls.

## III.

Defendant Webster received a sentence of 50 years for his conviction of violating 21 U.S.C. § 848 (1976), a provision which is sometimes called "the kingpin statute" because it is designed to apply to ringleaders of large-scale illegal narcotics operations. In addition, Webster, along with defendant Thompson, was found guilty of violating 18 U.S.C. § 1962(c) (1976), part of the Racketeer Influenced and Corrupt Organizations ("RICO") statute. Finally, the jury convicted Webster of conspiracy to violate narcotics laws, 21 U.S.C. § 846 (1976), of eighteen counts for unlawful use of the telephone, 21 U.S.C. § 843(b) (1976), and of three counts charging interstate travel in aid of an unlawful activity, 18 U.S.C. § 1952(a)(3) (1970). He was sentenced to

twenty years for the RICO conviction, thirty years for the conspiracy conviction, eight years for each of the unlawful use of the telephone convictions, and five years for each of the interstate travel convictions. All sentences were to run concurrently with the fifty-year sentence under § 848. The trial judge provided in the sentencing order that if convictions on all counts should be affirmed on appeal, he would set aside the sentences imposed for the telephone counts "as merging into the greater sentence imposed under" the conspiracy count. A special parol term of fifteen years was imposed in addition to the term of imprisonment under § 848.

Webster attacks his sentences on a variety of grounds.

## A. The Propriety of the Jury Instructions Regarding § 848

The provisions of 21 U.S.C. § 848(a) call for punishment of "[a]ny person who engages in a continuing criminal enterprise." A person is engaged in a continuing criminal enterprise if—

(1) he violates any provision of [21 U.S.C. §§ 801–966] the punishment for which is a felony, and

(2) such violation is part of a continuing series of violations of [21 U.S.C. §§ 801–966]—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

21 U.S.C. § 848(b).

Count 34 of the indictment charged Webster with the violation of § 848, alleging that he had transgressed 21 U.S.C. § 841(a)(1) (unlawful manufacture, distribution, dispensing, or possession with intent to manufacture, distribute, or dispense), 21 U.S.C. § 843(b) (unlawful use of the telephone), and 21 U.S.C. § 846 (conspiracy) "as alleged in Counts One [sic] through Counts Thirty-three [sic] of this Indictment which are incorporated herein by reference, which violations were part of a continuing series of violations . . . ."

■ Count 1 charged violations of the RICO statute, viz. 18 U.S.C. §§ 1961, 1962(c), 1963. Counts 30 through 33 charged violations of 18 U.S.C. § 1952(a)(3) (interstate travel in aid of an unlawful activity), and 18 U.S.C. § 2 (aiding and abetting). None of those provisions are among the ones described in 21 U.S.C. § 848(b) as comprising a "continuing criminal enterprise."

In its instructions, the court incorrectly informed the jury that the violations of 18 U.S.C. § 1952(a)(3) could support conviction under § 848. The defendant did not complain of this aspect of the charge, and even if we consider the judge's instruction to be plain error, nevertheless, we consider the error harmless. First, the substantive requirements needed to make out the interstate-travel charges required findings of a business enterprise involving violations of 21 U.S.C. § 841(a) and § 846, which are themselves within § 848. Second, the same jury convicted Webster of the conspiracy count and of eighteen telephone-use counts, all of which do lie within § 848. Thus, a plenitude of counts remain to support Webster's conviction under § 848.

## B. The Method of Giving Jury Instructions Regarding § 848

■ Webster contends that, in instructing the jury, the trial judge improperly repeated and highlighted the elements of a violation of 21 U.S.C. § 848 in reference to Webster. Reading the relevant portion of the instructions reveals, however, that the contention is frivolous. The judge employed a customary communicative and pedagogical technique of first providing an overview, then giving a summary, and finally adding the details. The purpose is to allow the listener to keep the context in mind when the details are presented, rather than becoming mired in a morass of unorganized minutia. It may have been to Webster's disadvantage for the jury to have

received the instructions concerning § 848 with such clarity, but that is not a disadvantage about which he may complain.

## C. *"Substantial Income or Resources"*

 Webster argues that "in the context of this case" the phrase "substantial income or resources" used in § 848(b)(2)(B) is unconstitutionally vague and that, given its vagueness, there was insufficient evidence for the jury to have convicted him. Webster's argument, to say the least, curiously juxtaposes a constitutional "void for vagueness" challenge with an insufficiency of the evidence claim. However, although it might have been preferable for Congress to have used language somewhat more specific than "substantial income or resources," the unconstitutional-vagueness argument has been consistently rejected. *See, e. g., United States v. Valenzuela*, 596 F.2d 1361, 1368 (9th Cir. 1979), *cert. denied*, 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979) ("Finally, we see no fatal vagueness problem in the requirement that a criminal enterprise defendant must have received 'substantial income or resources' from his or her activity. The criminal enterprise statute would have been valid even if Congress had omitted such a financial limitation. We see no reason to strike down the statute because Congress has chosen to provide some measure of protection to petty criminal enterprise defendants in this regard."); *United States v. Cravero*, 545 F.2d 406, 410–11 (5th Cir. 1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977) and 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). We agree with those decisions.

 As for the insufficiency charge, given the quantity of drugs which were shown to have been moving in and out of Webster's possession, the jury would have been justified in concluding that he had received tens of thousands or even hundreds of thousands of dollars from his drug business. The evidence was thus more than sufficient for conviction.

## D. *21 U.S.C. § 846 as a Lesser Included Offense under § 848*

Even though the sentences run concurrently, Webster challenges the propriety of being convicted under both § 846, the conspiracy count, and § 848 when the underlying transactions are the same. He argues that § 846 is a lesser included offense of § 848 and that sentencing for both violates the double jeopardy clause of the Constitution.

Although at least two circuit courts of appeals have stated that § 846 is a lesser included offense of § 848, *see United States v. Stricklin*, 591 F.2d 1112, 1123 (5th Cir. 1979), *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979); *United States v. Sperling*, 560 F.2d 1050, 1055 (2d Cir. 1977), it is unnecessary that we decide the issue. At oral argument, counsel for the United States admitted that § 846 is a lesser included offense of § 848 and thus that the offenses merged. Accordingly, we hold that since Webster's sentence under § 848 will stand, his conviction under § 846 must be stricken.

## IV.

Count 1 of the indictment charged defendants Webster and Thompson with violating 18 U.S.C. § 1962(c) (1976), part of the "Racketeer Influenced and Corrupt Organizations" ("RICO") statute, 18 U.S.C. §§ 1961–1968 (1976). Section 1962(c) forbids any person from conducting an enterprise's affairs through a pattern of racketeering activity. Defendants contend that the evidence offered at trial is insufficient to convict them of the charge. Before passing to the merits of Webster and Thompson's claim, we will consider the government's suggestion that the "concurrent sentence" doctrine allows us to avoid confronting the substance of their contentions.

## A. *The Concurrent Sentence Doctrine*

 The sentences imposed upon Thompson and Webster run concurrently with other sentences we hold valid. We may assume, for the purposes of this case, that under the "concurrent sentence" doc-

trine, it is permissible to affirm the convictions without investigating whether they were for some reason erroneous, provided we can foresee with reasonable certainty that no adverse collateral consequences will redound to the defendant. *United States v. Vargas*, 615 F.2d 952, 956–60 (2d Cir. 1980); *United States v. Lampley*, 573 F.2d 783, 788 (3d Cir. 1978). *See United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980) (Russell, J., concurring and dissenting); *Close v. United States*, 450 F.2d 152, 155 (4th Cir. 1971), *cert. denied*, 405 U.S. 1068, 92 S.Ct. 1513, 31 L.Ed.2d 799 (1972).

In this case, however, we find we cannot predict with certainty whether the RICO convictions will at some future point work some unforeseen harm to the defendants. As the Supreme Court stated in *Benton v. Maryland*, 395 U.S. 784, 791 n.7, 89 S.Ct. 2056, 2061 n.7, 23 L.Ed.2d 707 (1969), "an attempt to impose collateral consequences after an initial refusal to review a conviction on direct appeal because of the concurrent sentence doctrine may well raise some constitutional problems." We refuse to place the risk of future collateral consequences upon the defendants. We prefer to follow the lead of the Eighth Circuit which, in circumstances similar to the present, recently exercised its discretion to review a RICO count "because of the possible stigma stemming from the connotations surrounding the offense of 'racketeering.'" *United States v. Anderson*, 626 F.2d 1358, 1361 n.2 (8th Cir. 1980). Therefore, exercising our discretion under the concurrent sentence doctrine, we elect to review the RICO convictions.

## B. *The RICO Convictions*

■ Defendant Webster, who was portrayed by the prosecution as the head of a major drug distribution network in Baltimore, lived with defendant Thompson, who owned and operated a business known as the 1508 Club Tavern and Liquor Store. According to the prosecution, Webster participated in the operation of the 1508 Club, which in turn was used to facilitate the drug distribution operation. Evidence introduced at the trial tended to show that, by means of the telephone company's call-forwarding service, telephone calls to Webster's and Thompson's home telephone (which was tapped by court order) were frequently forwarded to the telephone at the 1508 Club; that Club facilities and personnel were used to accept and relay narcotics related messages; and that, on at least one occasion, a Club employee was asked by Webster to provide Club-owned drinks to one of Webster's narcotics customers who was waiting for drugs to be brought so that a transaction could take place.

The government charged Webster and Thompson under a RICO provision which states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (1976).[3] The statute defines "enterprise" as any individual or group of associated individuals. *Id.* § 1961(4). Any federal offense involving dealing in narcotic or other dangerous drugs falls within "racketeering activity." *Id.* § 1961(1)(D). Two acts of racketeering activity within ten years of each other, at least one of which occurred after October 15, 1970, constitute a "pattern of racketeering activity." *Id.* § 1961(5).

Count One of the indictment charged Webster and Thompson with operating the 1508 Club enterprise through a pattern of

---

**3.** Section 1962(a) makes it unlawful for a person who has received income from a pattern of racketeering activity to use such income to acquire or operate any enterprise whose activities affect interstate commerce. Section 1962(b) forbids any person "through a pattern of racketeering activity" from acquiring an interest in or gaining control of such an enterprise. Although the evidence in the case might have sustained charges under subsections (a) and (b), the government indicted defendants for violating only subsection (c).

racketeering activity, *i. e.*, the illegal drug activities. The evidence which the government has offered as sustaining the convictions under subsection (c) indicates that the facilities of the 1508 Club were regularly made available to, and put in the service of, the defendants' drug dealing business. However, the evidence completely fails to demonstrate that the affairs of the 1508 Club were promoted in any way by the illegal drug racketeering. The prosecution might have attempted to prove that the business of defendants' bar was improved because people were attracted to it by the availability on the premises of illicit drugs. Yet it did not do so. To the contrary, the prosecution suggests in its Brief that the bar was not even a profit-making operation and that all benefit flowed in the opposite direction.

In response the government asserts that the statute requires only a "substantial nexus" between the racketeering and the conduct of the enterprise's affairs, regardless of which direction the assistance flows. The government contends that it is sufficient under § 1962(c) to show that the enterprise advances the interests of the racketeering activity.

However, the language of § 1962(c) contains no suggestion that Congress intended to reach situations in which the racketeering activity made use of the resources of the enterprise but did not provide the enterprise with any benefit, especially an illegitimate benefit, for that use. In the context of the instant case, § 1962(c) would prohibit conducting the enterprise, the 1508 Club, through a pattern of racketeering activity, the illegal drug transactions. But, there is no evidence that by racketeering activity the affairs of the 1508 Club were conducted. Only the affairs of the drug dealing enterprise were promoted. Section 1962(c) simply does not by its language extend to a situation where the racketeering activities are advanced through the assistance of an enterprise.[4] The statute speaks solely of conduct of the affairs of the enterprise through racketeering. The evidence shows only conduct of the racketeering through the enterprise. Conducting the enterprise through racketeering is plainly not the same as conducting the racketeering through the enterprise. *See generally* Note, *Elliott v. United States, Conspiracy Law and the Judicial Pursuit of Organized Crime through RICO*, 65 Va.L.Rev. 109 (1979).

A reading of the statutory language—"to conduct such enterprise's affairs *through* a pattern of racketeering activity"—supports our view that it is the enterprise's affairs which must be advanced by racketeering. The meaning of the word "through" sug-

---

4. Since the government elected to charge that the 1508 Club was the "enterprise" whose affairs were furthered "through a pattern of racketeering activity," we need not determine whether the prosecution could have indicted the defendants for conducting the *drug business* (the statutory "enterprise") "through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

It is to be noted that the 1508 Club was an ostensibly legal enterprise. Whether § 1962(c) permits indictment for conducting the affairs of an *illegal* enterprise through a pattern of racketeering activity is a question that has deeply divided the courts of appeals. *Compare, e. g., United States v. Turkette*, 632 F.2d 896 (1st Cir., 1980) and *United States v. Anderson*, 626 F.2d 1358 (8th Cir. 1980), *with United States v. Rone*, 598 F.2d 564 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) and *United States v. Altese*, 542 F.2d 104 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039 (1977). *See also United States v. Sutton*, 605 F.2d 260, 97 S.Ct. 736, 50 L.Ed.2d 750 (6th Cir. 1979), *reversed en banc*, 642 F.2d 1001 (6th Cir., 1980) (5–4 decision). In a brief footnote in *U. S. v. Whitehead*, 618 F.2d 523, 525 n.1 (4th Cir. 1980), handed down prior to the decisions in two very recent circuit decisions (*Turkette, supra* and *Anderson, supra*), we indicated agreement with decisions permitting indictment for conducting an illegal enterprise's affairs through a pattern of racketeering.

However, the present case does not involve that controversy. Legal or illegal, the 1508 Club simply did not have its affairs conducted or promoted through a pattern of racketeering activity. Here, only the affairs of the drug enterprise, which the government did not elect to rely on in framing its § 1962(c) indictment (selecting the 1508 Club instead), were promoted. Hence, there is no occasion here for us to address the "legal enterprise" v. "illegal enterprise" issue.

gests that, at least where the government elects to cast a § 1962(c) indictment in a form in which the "enterprise" is the legal or ostensibly legal activity, and not the racketeering activity itself, the statute should be applied in such a way as to punish where the racketeering activity advances the nonracketeering business but not where the only relation between the two consists of benefits which the racketeering activity derives from the nonracketeering enterprise.

In *United States v. Nerone*, 563 F.2d 836 (7th Cir. 1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978), defendants were charged with having run a casino gambling operation in the basement of a modular home located in a mobile home park which was operated by a corporation which was owned and run substantially by those conducting the casino and by their relatives. The Seventh Circuit reversed convictions under § 1962(c) because "the prosecuting team apparently assumed, but did not prove, that the affairs of the corporate enterprise charged in the indictment were advanced through racketeering." 563 F.2d at 852. *Nerone* emphasized that

> the Congressional use of the word "through" in § 1962(c) was not intended to be meaningless. [Defendants] submit, correctly we think, that the most logical definitions to ascribe to that word as used in the statute are "by means of, in consequence of, by reason of."

*Id.* at 851. The court noted that the jury would have been able to infer from the evidence adduced that the racketeering activity had been "facilitated through the cover of a legitimate enterprise." *Id.* at 851. That inference, however, was insufficient to sustain a conviction under § 1962(c).

The proper construction of § 1962(c) was discussed in *United States v. Mandel*, 591 F.2d 1347, 1375 (4th Cir.), *vacated on other grounds by an equally divided court*, 602 F.2d 653 (4th Cir. 1979) (en banc) (per curiam), *petition for rehearing en banc denied by an equally divided court*, 609 F.2d 1076 (4th Cir. 1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). The *Mandel* panel determined that unless the word "through" was given meaning,

> anyone who used income from a legitimate business to participate in racketeering activity would be guilty of a violation of § 1962(c). We do not believe Congress meant to sweep so broadly, especially in light of the mandatory forfeiture penalties for a § 1962 violation. 18 U.S.C. § 1963(a).

*See also United States v. Anderson, supra*, at 1366–67 n.13 (recognizing that the requirement that a defendant operate "through" a pattern of racketeering activity can pose substantive limitations on prosecutorial zeal in the setting of infiltration of legitimate business). Although the *Mandel* panel opinion is not binding upon us, still, to the extent of its persuasiveness, as with any legal dissertation, it is pertinent. The *Mandel* panel's interpretation of § 1962(c) supports our view that § 1962(c) requires more than merely some connection or even a "substantial nexus" between a lawful enterprise and the prohibited pattern of racketeering. Rather, the racketeering activities must be designed to further the business of the enterprise charged in the indictment.

In *United States v. Rubin*, 559 F.2d 975, 989–90 (5th Cir. 1977), *vacated and remanded on other grounds*, 439 U.S. 810, 99 S.Ct. 67, 58 L.Ed.2d 102 (1978), the Fifth Circuit affirmed a conviction in which the defendant was charged with having embezzled union and employee-welfare-benefit-plan funds. *Rubin* concerned a narrow point which does not lend support to the government's position. The point turned on whether, under § 1962(c), a jury instruction had to highlight that the racketeering activity must aid the legitimate enterprise, rather than the other way around, by defining "through" as signifying "by means of." The decision was that use of "through" in the instruction, the very statutory word itself, made the instruction sufficient.

We, therefore, hold that the prosecution was required to prove that the "enterprise" (here, by choice of the government, the 1508

Club) had its affairs advanced or benefitted in some fashion, direct or indirect, by the pattern of racketeering activity. Since the evidence was insufficient to allow a conclusion that the pattern of racketeering had advanced the purposes of the bar in any way, Webster's and Thompson's convictions for violating § 1962(c) must be reversed.

## V.

After the indictments in 79–5240 were handed down, an arrest warrant was prepared for Webster. According to the government, a search of Webster incident to his arrest on the warrant revealed large quantities of illicit drugs. In a separate, nonjury trial ( # 79–5204) Webster was convicted of violating 21 U.S.C. § 841(a)(1) (possession with intent to distribute heroin); 18 U.S.C. § 2 (aiding and abetting); and 21 U.S.C. § 844(a) (possession with intent to distribute cocaine). He was sentenced to one year for the conviction of possessing cocaine with intent to distribute and to thirty years for the heroin possession, both sentences to run concurrently with the terms in 79–5240. The court also imposed a special parole term of thirty-five years for the heroin possession, to run concurrently with the special parole term in 79–5240.

### A. *Failure to Suppress*

In 79–5204 Webster contends that the drugs found in his possession at the time of arrest should have been suppressed as the fruits of illegal wiretaps. As we have indicated above, the wiretap orders, their supporting documents, and the underlying Maryland statute all pass statutory and constitutional muster. The challenged evidence of possession was, therefore, properly admitted.

### B. *The Polygraph Issue*

██ Webster's defense in the nonjury trial was that the arresting officers were lying. He testified that the drugs purportedly found on his person and in his car were not his, that despite a search at the moment of arrest, the drugs were not "found" until a second search back at the police station.

During the search at the police station, according to Webster,

> the officer who had [Webster's] suit coat stated in a joking manner, [']Hey, look what I found.['] In his hand he showed Mr. Webster an aluminum packet in a bag, and in another laughing statement he said [, ']We have to give the officer who shook you down while you were in the car a reprimand.[']

Concerned that his recent convictions in 79–5240 and a prior record, including a conviction for perjury, might impair his credibility, Webster elected a nonjury trial. He then offered to take a polygraph test before a qualified person selected by the prosecution, with the prosecution invited to participate and frame the questions, so long as the results could be admitted as evidence in the nonjury trial.

The prosecution refused to accede to the admission of any polygraph evidence whatsoever, and the district court upheld the prosecution's objection. "[If] I permitted the defendant to take a polygraph examination in this case and to put evidence of those results in, I would certainly give the government the same opportunity with regard to the law enforcement officials. I think that alone probably ends the polygraph consideration."

The question before us, of course, is not whether it would have been wrong had the district judge ruled the other way. The broad discretionary powers of the district judge perhaps would have made admission of polygraph evidence proper. On that point, it should be remembered that it was the defense not the prosecution who sought introduction and who agreed to be bound by the results even before the polygraph test was taken. Furthermore, the case was tried to the court, not to a jury, so the underlying fear that juries would be overly influenced by such evidence was not a factor here. Yet we are on the other side of the coin. A decision to deny polygraph evidence is also discretionary. *See United States v. Smith*, 552 F.2d 257, 260 n.3 (8th Cir. 1977). The judge here did not abuse his discretion in excluding polygraph evidence.

## VI.

█ Defendant Herbert Leon Johnson was convicted of one count for conspiracy to distribute or to possess with intent to distribute narcotics, in violation of 21 U.S.C. § 841(a)(1), and of two counts for using the telephone to cause or facilitate the commission of a felony offense, namely, conspiracy to distribute narcotics in contravention of 21 U.S.C. § 843(b). In the indictment, the government charged that Johnson was a heroin distributor for Webster and Thompson. Johnson contends that the evidence introduced against him by the government is insufficient to support his convictions.[5]

In a statement not contradicted by the government, Johnson argues that the evidence against him consisted substantially of the testimony of one witness, augmented by a series of drug-related taped telephone conversations to which Johnson was a party. The evidence may be summarized as follows.[6] In the course of giving him drugs, the witness testified, Webster told him to see Johnson if he (the witness) could not find Webster. However, the witness also stated that he had never received any narcotics from Johnson. Moreover, there was no evidence that the witness ever discussed making a narcotics transaction with Johnson.

The wiretaps did reveal several drug-related conversations, including discussions concerning the purchase and sale of narcotics. On June 22, Webster told Johnson he would not sell an unspecified quantity of drugs to Johnson unless Johnson first paid

**5.** Appellant Johnson also challenged the government's playing of wiretapped conversations to informants for the purpose of identifying his voice. Since we reverse Johnson's convictions on other grounds, we need not decide whether such use violates the wiretap statute. *See* 18 U.S.C. § 2515 (1970); Md.Cts. & Jud. Proc.Code Ann. § 10–405 (1980); *United States v. Rabstein*, 554 F.2d 190, 193 (5th Cir. 1977).

**6.** In addition to the evidence abstracted in text, Johnson's name was mentioned in two taped conversations between other defendants. In the first call, during a drug-related conversation, one Moe says to Webster "this is different Johnson from that other, ain't it?" However, Agent Miller testified for the government that

for them. A government witness testified that other portions of the conversation demonstrated that Webster told Johnson he was "trying to get his narcotics" distribution together. Later that same day Johnson called back to ask what Webster would do for him if Johnson got a "tray" (three hundred dollars) together. Webster refused to sell Johnson "anything" (a package of narcotics) for less than $400. Two days later, on June 24, in a conversation between defendant Norma Thompson (who resided with Webster) and Johnson,[7] Thompson asked if Johnson had "something" (money) for Webster, in exchange for "these things" (drugs). In response, Johnson promised to "ride down there." During the evening of June 24th, Johnson again telephoned Webster to order a $100 package of "girls' suits" (cocaine). Later that same night, Johnson reported by phone that the "he" (heroin) was all right. In a conversation three days later, on June 27th, Johnson reported he had a "deuce" ($200) now but would not have another "deuce" until morning. Webster initially wanted "everything up top" (all the money first), but apparently relented and agreed to see Johnson. The next day, on the 28th of June, Johnson called Webster to ask if his "sister" was home (if Webster had any cocaine) to which Webster demurred. Johnson then promised to see Webster "later on."

In the final conversation relevant here, on June 29th, Webster telephoned Norma Thompson to ask if "anybody" had called. During their conversation "Herb" (Johnson) was mentioned twice:

"Johnson" in this context referred to a narcotics package. In the second conversation, defendant Thompson merely reported to Webster that Johnson had telephoned.

Other testimony at trial revealed that Johnson and Webster lived two doors apart, that one witness formerly involved with Webster "knew of" Johnson, and that Webster once called Johnson to ask him to "walk over," and another time Johnson told Webster by phone he would "be ready later on."

**7.** The transcript of the tape attributed the call to defendant Norman George Johnson, but at trial Agent Miller testified the caller was actually Herb Johnson.

NORMA: Yep, let me get my pad, Herb call [*sic*] and wanted to know if I had anything and I told him, he had to wait for you, Wolfe called two times and he said call him at home cause he's ready, Tommy said he's on his way over, I told him may by the time he get over probably he probably not heard from him cause he say wanted, wanted me to do something, I said wait and see you; Fat Moe said that let's see Fat Moe said that he would ah, he got your message that you called him last night and that he will bring the money over to me tomorrow...

. . . . .

NORMA: Where you at home?

WEBSTER: Yeah, I'm going to see Herb.

The question demanding our resolution is whether the evidence summarized above, viewed in a light most favorable to the government is sufficient to convict Johnson of conspiracy to distribute, or possession with intent to distribute narcotics. We conclude the evidence is not sufficient and therefore reverse Johnson's conviction under the conspiracy count. The evidence against Johnson might have supported a conviction for possession or purchase of narcotics. However, the government did not indict Johnson for possessing or purchasing drugs. Rather it charged him with unlawfully conspiring to distribute or to possess with intent to distribute narcotics. See 21 U.S.C. § 841(a). Even assuming that several of the taped conversations resulted in drug purchases by Johnson, nothing in the tapes or testimony contradicts the supposition that Johnson sought narcotics merely for his personal use. While the government may have proved that Johnson used drugs, it did not prove he was a "heroin distributor" as the indictment charged.

We have considered the fact that in less than a week Johnson engaged in several phone conversations concerning the purchase of narcotics. From these conversations, the jury might have reasonably inferred that Johnson in fact purchased several hundred dollars worth of cocaine and heroin. However, proving use or purchase of narcotics is quite different from proving distribution or agreement to distribute. Particularly where, as here, the deduction that Johnson distributed or conspired to distribute drugs itself rests upon the assumption that Johnson actually purchased drugs from Webster, the inferential leap from purchase/user of such small quantities to distributor of them is too great to support a conviction for conspiracy to distribute.[8]

The June 29th call from Webster to Thompson admittedly reads like a list of messages from Webster's distributors, all of whom were charged with conspiracy at trial below. If the record contained additional evidence which conclusively linked Johnson to the co-conspirators, or which demonstrated Johnson actually distributed, we would be inclined to view this conversation as tending to support an inference of conspiracy to distribute. Standing alone, however, the conversation taints Johnson only because he is reported by Thompson to have telephoned the same day as Webster's dealers. Again, there is no proof Johnson telephoned for any other purpose than to chat or at most to supply his own habit. We decline to find guilt of distribution simply on the basis of association.

We recognize that intent to distribute may be inferred from the possession or purchase of large quantities of narcotics. See *United States v. Hutchinson*, 488 F.2d 484, 489 n.10 (8th Cir. 1973), *cert. denied*, 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974) (possession of over eleven ounces of

---

8. The limitations on the efficacy of wiretapped conversations to prove guilt are evident in this case. It is literally impossible for a drug transaction to be completed over the telephone. Thus, where proof of guilt rests almost entirely on wiretaps, as in Johnson's case, the factfinder is required to infer not only that a defendant actually purchased narcotics, but also that he agreed to distribute them or in some way to participate in the conspiracy to distribute. Unless the government also produces evidence of actual transactions, it is often impossible fairly to conclude that a defendant did more than engage in suspicious-sounding negotiations.

cocaine sufficient to justify inference); *United States v. Blake,* 484 F.2d 50, 58 (8th Cir. 1973), *cert. denied,* 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669 (1974) (possession of heroin valued at $4,200 supports inference). However, where, as in this case, the quantity and value of the assumed drug purchases are consistent with the maintenance of a personal habit, the government has not met its burden of proving guilt beyond a reasonable doubt. Therefore, defendant Johnson's conviction under the conspiracy count of the indictment must be reversed.

We have also concluded that Johnson's convictions for unlawfully using the telephone to cause or facilitate the commission of a felony offense, *see* 21 U.S.C. § 843(b) (1976), must be reversed. In drawing the indictment the government elected to identify the conspiracy charge as the "felony" committed by use of the telephone. Since we today reverse the conspiracy conviction the telephone use convictions must also fall.

## VII.

■ The evidence presented against Adams, Christian, and Wills was sufficient to identify and convict them. Some of the defendants other than Webster complain that refusal to sever their trials from Webster's impermissibly prejudiced them because the jury was unable to give them sufficiently individualized attention and because juxtaposition with Webster and Webster's alleged New York supplier (Adams) made them seem like bigger-time distributors than they actually were. There is inherently present in every refusal to sever some theoretical disadvantage to the defendant. Yet it is within the trial judge's discretion to determine whether the actuality of prejudice exists sufficiently to outweigh the interests of judicial economy. *See* Fed.R.Crim.P. Rule 14; *United States v. McLaurin,* 557 F.2d 1064, 1075 (5th Cir. 1977), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978).

## VIII.

In light of *Bifulco v. United States,* 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205

(1980), all of the special parole sentences except that imposed upon Walter Webster in No. 79–5204 should have been vacated. It is probable that such has been done, but the record before us does not disclose that action to vacate has been taken. To be on the safe side, we therefore order vacation of all of the special parole sentences except that imposed upon Walter Webster in No. 79–5204.

*AFFIRMED IN PART, REVERSED IN PART.*