UNITED STATES of America,
Plaintiff-Appellee,

v.

Tom WELCH, Charles Cashell, William L. Satterwhite and James M. Cochran, Defendants-Appellants.

No. 80–1044.

United States Court of Appeals,
Fifth Circuit.
Unit A

Sept. 21, 1981.

Rehearing and Rehearing En Banc Denied Nov. 2, 1981.

Dale Long, Tyler, Tex., for Welch.

R. L. Whitehead, Jr., Longview, Tex., for Cashell.

Charles H. Clark, Tyler, Tex., for Satterwhite.

Lynn S. Patton, Longview, Tex., for Cochran.

John H. Hannah, Jr., U. S. Atty., Herbierto Medrano, Christian Harrison, Asst. U. S. Attys., Tyler, Tex., for plaintiff-appellee.

Before WISDOM, POLITZ and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

This case involves the conviction of four defendants on charges of conspiracy to obstruct the enforcement of the criminal laws of the State of Texas with intent to facilitate an illegal gambling business in violation of 18 U.S.C.A. § 1511, and of conducting the affairs of an enterprise affecting interstate commerce through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. § 1962(c). On appeal, defendants raise questions concerning joinder under Fed.R.Crim.P. 8(b) and 14 and sufficiency of the evidence to support the convictions on the conspiracy and the racketeering charges. In addition, they each raise a number of issues that involve whether the indictment was defective and whether the Government properly charged predicate acts sufficient to support the convictions on the racketeering count. We agree with defendant Satterwhite that the evidence as to him was insufficient to support his conviction on the racketeering count. As to Satterwhite, therefore, we reverse the RICO conviction. With respect to all charges involving the other three defendants, and with respect to Satterwhite's conviction on the conspiracy count, we affirm.

## I. *Facts*

With respect to sufficiency of the evidence questions, "[w]e can reverse only if we conclude that a reasonable jury could not find the evidence inconsistent with all reasonable hypotheses of the defendant's innocence." *United States v. Molina-Garcia*, 634 F.2d 217, 218–19 (5th Cir. 1981). We must view the evidence in the light most favorable to the Government and assume that all relevant credibility choices were made in favor of the Government. *Glasser v. United States*, 315 U.S. 60, 79, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Marx*, 635 F.2d 436, 438 (5th Cir. 1981). Although the trial of this case involved a great deal of conflicting testimony, the facts viewed in the light most favorable to the Government indicate the following:

### A. *Cantrell's Game*

Tom Welch was elected Sheriff of Gregg County, Texas in 1972, took office on January 1, 1973, and served in that position for eight years. A large illegal gambling operation had been conducted at the Foster farm in Gregg County by Raymond Cantrell for many years prior to Welch's election. Though the evidence indicated that Welch was aware of the gambling that occurred at the Foster farm while Welch was sheriff, the Sheriff's Office never closed down the game. Shortly after Welch was elected sheriff, he was seen at the Foster farm in the company of Cantrell. County sheriff's cars were seen on the farm property a number of times during Welch's term as sheriff and, although at least one disturbance at the game was quelled by Welch's Chief Deputy James M. Cochran, Cochran did not interfere with the game. In fact, one ex-deputy testified that when Cochran arrived, he "just stated that he knew there was going to be a little game that night, and everything was okay." On one occasion, two men who had attempted to rob the game were picked up by two deputies and taken to the sheriff's home. The sheriff warned them not to disturb the game because those were the sheriff's people down there and he was running a respectable game. There was some evidence introduced at trial that the sheriff received money to protect the gambling game.

In the summer of 1978, the area in which the Foster farm was located was annexed inside the City of Longview, Texas. Cantrell decided to move his game outside the

jurisdiction of the City. Cantrell eventually moved his game to a farmhouse known as the Pat Smith place. Prior to the time that he moved the location of the game, a deputy sheriff was sent to the Foster farm to deliver a message to Cantrell stating that Pat Smith (who ran a farm located outside the city limits) had been admitted to the Good Shepherd Hospital. Cantrell received the message and told the deputy to "advise Sheriff Welch that he did appreciate it." When the deputy relayed this information to the sheriff, the sheriff simply thanked him. After Cantrell moved his game to the Pat Smith place, the sheriff placed a special "vacation" patrol on the new gambling site while it was being renovated and, on occasion, the sheriff watched the progress being made on the renovation.

County Commissioner Bill Satterwhite's workmen serviced the private road leading up to the Foster farm on occasion. After Cantrell decided to change the location of the game, Satterwhite instructed his men to build a parking lot at the new casino site. The parking lot was constructed using county workmen, materials, and equipment. A few months later, the FBI raided the casino and closed it down. Satterwhite and Cantrell met with one county employee who had worked on the parking lot, Garland Grimes, and arranged for Grimes to tell the FBI that without Satterwhite's knowledge, Grimes had worked out a deal with Cantrell to build the parking lot. At trial, however, Grimes testified that he was paid by Satterwhite to work on the parking lot.

### B. The Fairground Games

Once a year the Longview Jaycees Gregg County Fair and Livestock Show, sponsored by the Jaycees, comes to Gregg County. During 1977 and 1978, the concession manager was Seymour Berger Schlar. During those years, the Sheriff's Office handled the security for the midway area of the fair.[1] Illegal gambling openly and obviously occurred on the midway at the fair. In both 1977 and 1978, Schlar paid $1,000 to Welch for protection and freedom from harassment on the midway.[2] Several deputies from the Sheriff's Office patrolled the midway, guarded the illegal gambling activities, and received money from Schlar during the 1977 fair and after the 1978 fair. Justice of the Peace Charles Cashell was present on the midway at the 1978 fair on all nights, and he also received money from Schlar after the fair. All those who patrolled the midway were directed to handle any complaints with respect to gambling there at the fair, and they were apparently

1. The Jaycees sponsored the fair and were in charge of arranging for security. During some years the Jaycees contracted with private security firms to work at the fair, and off-duty city policemen and county deputies generally worked there as well. Traditionally, certain members of the Sheriff's Office patrolled the midway. The Jaycees had no control over which officers would be hired to work at the fair, or what areas they would be assigned to patrol.

2. With respect to the payments to Welch, Schlar testified as follows:

Q. Mr. Sclar, in 1977, did you pay Sheriff Tom Welch $1,000.00?
A. Yes, I did.
Q. Did you pay Sheriff Tom Welch $1,000.00 again in 1978?
A. Yes, I did.
Q. Now, sir, would you please tell members of the Jury where and how you paid the Sheriff those $2,000.00?
A. I'm a little vague about '77. I believe it was in two payments, but I'm not certain whether it was in his office, or at the Midway. That's a little vague in my mind. However, I know I made two payments of $500.00 each.
Q. In 1977?
A. Correct.
Q. All right, sir. What about 1978?
A. In 1978 I gave the Sheriff $500.00 in his office on a Thursday—I don't know the dates—and the remaining $500.00 on a Saturday at the Fairgrounds.
Q. All right, sir. Mr. Sclar, why did you give the Sheriff, Tom Welch, $1,000.00 both in 1977 and 1978?
A. Well, I would think for protection and freedom from harassment from the Midway.
Q. Did that include illegal games at the Midway?
A. I beg your pardon?
Q. Did that include freedom from harassment and protection for illegal games at the Midway?
A. For all games, illegal and otherwise.

quite successful at discouraging people from filing formal complaints. On one occasion, for instance, when undercover FBI Agent Tom Kilmer complained to one of the deputies patrolling the midway that he had lost more than $120.00 at a booth that was allowing gambling, the deputy stated that if he were to arrest the people at the booth, he would also have to arrest Kilmer for gambling.[3] None of the gambling games at the fair were ever shut down.

### C. Attempted Murder—The Barn Stakeout

In early 1974, Captain Don Hale discussed with Welch the use of an informant to apprehend two suspected criminals—James Edward Makarski and "Danny Boy" Aldridge. Welch agreed to the use of the informant, and it was arranged that Hale would be the informant's contact and that Cochran would be the go-between for Hale's contact with Welch. The informant, former Sheriff's Office employee Larry Burke, relayed information to Hale about the activities of Makarski and Aldridge. To help him gain the confidence of Makarski and Aldridge, Burke wanted a radio that would pick up the police frequency. He requested that Hale alter a radio for him to serve that purpose. Although Welch and Cochran approved the plan, the alteration of the radio was unsuccessful. According to Burke, he was then given several assignments by Makarski as a test of his reliability and trustworthiness. One assignment was the commission of a robbery at the Pines Motel. While there, accompanied by a girlfriend of Aldridge and Makarski,

Burke killed one prostitute and severely wounded another.

Hale testified that a plan to kill Burke was subsequently devised to avoid the embarrassment that would result if it became known that the man who committed the "heinous" crime at the Pines Motel had been working for the Sheriff's Office. Hale was to give information to Burke to induce Burke, Makarski, and Aldridge to attempt to rob the safe at the County Barn.[4] The plan was that while the three men attempted to rob the safe, they would be killed. It would then appear that Burke was a "hero" who died accidentally while helping the Sheriff's Office apprehend two well-known criminals, and the Sheriff's Office would be saved from any embarrassment that might arise as a result of having to arrest its own informant for murder.

Welch, Hale, and Satterwhite met at the County Barn to set up the stakeout. Satterwhite arranged to bring to the Barn a safe as well as some hay to be used for cover and for the protection of the deputies. Later, on the night of the operation, Satterwhite drove three deputies to the Barn in a county dump truck. At the Barn Satterwhite showed the deputies the office where their weapons had previously been placed, and unlocked the office so the deputies would have access to the weapons. He drove away before the would-be robbers arrived. When the robbers did arrive, they discovered the deputies and escaped.[5]

### D. The Indictment

On August 3, 1979, a federal grand jury sitting in Tyler, Texas returned a six-count

---

**3.** This incident involved Deputy Sheriff Billy Ray Roach, who died during the pendency of this appeal.

**4.** Actually, there was evidence at trial that information intended to induce Makarski and Aldridge to commit a robbery at a pre-designated place had been supplied to Burke prior to the incident at the Pines Motel. According to Hale, however, the plan to kill Burke, Makarski, and Aldridge was devised only after the murder at the Pines.

**5.** During the time period involved in this case, in addition to their involvement in Cantrell's

game, the gambling at the fairgrounds, and the Barn stakeout, the defendants were also involved in various other illegal acts. Sheriff Welch and Chief Deputy Cochran accepted money from a motel and club operator, apparently in return for allowing the club to remain open after hours. Welch also gave special consideration to a number of prisoners in the county jail in return for the work they performed on his farm. Justice of the Peace Cashell obtained driver's license information through the Sheriff's Office and sold it to various trucking companies.

indictment against twelve individual defendants. Count I of the indictment alleged that six defendants (none of whom are involved in this appeal) conducted, financed, managed, supervised, directed, or owned an illegal gambling business in violation of 18 U.S.C.A. § 1955. Count II charged the same defendants with a conspiracy to violate section 1955 in violation of 18 U.S.C.A. § 371. Prior to trial, Counts I and II were severed from the remaining counts and certain parties were severed from Counts I and II. These counts are not before this Court on appeal.

In Count III of the indictment, defendants Tom Welch, Raymond L. Cantrell,[6] William L. Satterwhite, and James M. Cochran were charged with a conspiracy to obstruct the enforcement of the criminal laws of the State of Texas with the intent to facilitate an illegal gambling business in violation of 18 U.S.C.A. § 1511.[7] This conspiracy, which involved the facilitation of Cantrell's game, was alleged to have existed from January 1, 1973, to January 17, 1979. Count IV of the indictment charged Tom Welch, Billy Eugene Bryan,[8] Billy Ray Roach,[9] and Charles Cashell (along with several unindicted co-conspirators) with a second conspiracy to obstruct the enforcement of the criminal laws of the State of Texas with the intent to facilitate an illegal gambling business in violation of 18 U.S.C.A. § 1511. The indictment charged that this conspiracy, involving the gambling at the fairgrounds, took place in September 1978. Count V alleged that from January 1, 1973 to January 17, 1979, Sheriff Tom Welch, Deputy Sheriffs James M. Cochran and Billy Ray Roach, County Commissioner William L. Satterwhite, and Justice of the Peace Charles Cashell conducted and participated in the conduct of the affairs of an enterprise—the Sheriff's Office of Gregg County, Texas—through a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962(c).[10]

---

**6.** Raymond Cantrell was severed from the indictment prior to trial.

**7.** Section 1511 provides:
　(a) It shall be unlawful for two or more persons to conspire to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if—
　(1) one or more of such persons does any act to effect the object of such a conspiracy;
　(2) one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and
　(3) one or more of such persons conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business.
　(b) As used in this section—
　(1) "illegal gambling business" means a gambling business which—
　(i) is a violation of the law of a State or political subdivision in which it is conducted;
　(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
　(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
　(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels, or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
　(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.
　(c) This section shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1954, as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization, except as compensation for actual expenses incurred by him in the conduct of such activity.
　(d) Whoever violates this section shall be punished by a fine of not more than $20,000 or imprisonment for not more than five years, or both.

**8.** Billy Bryan was severed from the indictment before the trial.

**9.** Billy Roach died during the pendency of this appeal.

**10.** Section 1962(c), which is one of the substantive provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), provides:
　It shall be unlawful for any person employed by or associated with any enterprise

With respect to Count V, Cochran was charged with three specific acts of racketeering: Conspiracy to obstruct the enforcement of the criminal laws of the State of Texas with intent to facilitate an illegal gambling business (act A),[11] conspiracy to murder (act G), and accepting a pecuniary benefit ($300) to exercise discretion as a public servant to allow the club at the Patriot Motel to operate in an unlawful manner (act R).

Satterwhite was charged with two specific acts of racketeering under Count V: Acts A (the Count III conspiracy involving Cantrell's game) and G (the conspiracy to murder charge).

Welch was charged with fourteen specific acts of racketeering under Count V: Act A (the Count III conspiracy involving Cantrell's game), conspiracy to obstruct the enforcement of the laws of the State of Texas with intent to facilitate an illegal gambling business (act B),[12] two counts of accepting a pecuniary benefit from Seymour Schlar to allow illegal gambling in the midway at the County Fair (acts C and D), solicitation of and conspiracy to murder (act G), seven counts of accepting pecuniary benefits (labor) from prisoners in return for exercising discretion as a public official (acts H through N),[13] accepting a pecuniary benefit in return for not arresting or apprehending a person pursuant to a lawful order (act O),[14] and accepting a pecuniary benefit ($100) to allow the club at the Patriot Motel to operate in an unlawful manner (act Q).

Finally, under Count V, Cashell was charged with three specific acts of racketeering: Act B (the conspiracy count involving the fairgrounds gambling), accepting a pecuniary benefit ($350) from Seymour Schlar to allow illegal gambling on the midway at the County Fair (act E), and obtaining driver's license information through the Sheriff's Office in return for a pecuniary benefit (act P).

The last count in the indictment, Count VI, charged Welch with a violation of the civil rights of a prisoner while incarcerated in violation of 18 U.S.C.A. § 242. The charge was based upon an alleged incident when Sheriff Welch beat an unresisting prisoner with the barrel of his pistol. This count was severed from the indictment on the second day of trial on the basis of misjoinder. The count was later dismissed in its entirety.

After a thirteen day trial, the jury returned a general verdict of guilty on Counts III, IV, and V against all defendants. Welch was sentenced to serve two consecutive five-year terms on Counts III and IV. With respect to his conviction on Count V, Welch was sentenced to serve ten years, the sentence to run concurrently with the sentences imposed for Counts III and IV. For their convictions on Counts III and V, Satterwhite and Cochran were sentenced to two concurrent five-year terms. Cashell was sentenced to two concurrent three-year terms for his Count IV and V convictions.

## II. *Misjoinder*

On appeal, the defendants raise three contentions involving the issue of misjoinder: (1) Under Fed.R.Crim. P. 8(b), those defendants charged under Counts III were misjoined with those defendants charged

engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

11. This allegation is the same as Count III and involved the gambling at Cantrell's game.

12. This is the same as Count IV and involved the gambling at the fairgrounds.

13. Paragraphs H and I allege that Welch accepted labor from certain individuals confined in the Gregg County Jail as consideration for

exercising his discretion as sheriff and not transporting these people to the penitentiary at the Texas Department of Corrections pursuant to a lawful order. Paragraphs J, K, L, M, and N allege that Welch accepted labor from certain individuals confined in the jail as consideration for exercising his discretion and granting these individuals special privileges during their confinement.

14. The act alleged in paragraph O of the indictment was severed after the start of the trial.

under Count IV; (2) under Fed.R.Crim. P. 14, those defendants charged under Count III were prejudicially joined with those defendants charged under Count IV; and (3) the original inclusion of Count VI violated Fed.R.Crim.P. 14. None of these contentions require that the defendants' convictions be reversed.

### A. Joinder of Defendants Under Rule 8(b)

■ All defendants claim misjoinder under Fed.R.Crim. P. 8(b). Rule 8(b), which governs the joinder of multiple defendants, provides:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

The issue of misjoinder under Rule 8 is a matter of law and, as such, is completely reviewable on appeal. *United States v. Marionneaux*, 514 F.2d 1244, 1248 (5th Cir. 1975), *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

■ The Count III conspiracy involved Cantrell's game, whereas the Count IV conspiracy involved the gambling at the fairgrounds. These conspiracies occurred at different times, involved different people (with the exception of Welch), and involved completely separate acts of gambling. The conspiracies charged in the two counts are not part of the same act or transaction. Hence, in order for the defendants in each of these counts to have been properly joined, it must be alleged that they participated in the same *series of acts or transactions* constituting an offense or offenses. "Separate conspiracies with different memberships may still be joined if they are part of the same series of acts or transactions."

*United States v. Grassi*, 616 F.2d 1295, 1303 (5th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). Thus, the inquiry of this Court must focus on whether the two separate conspiracies alleged by Counts III and IV are part of the same series of acts or transactions.

■ The question of what constitutes a series of acts or transactions has been before this Court a number of times. "Whether or not separate offenses are part of a 'series of acts or transactions' under 8(b) depends ... on the relatedness of the facts underlying each offense.... [W]hen the facts underlying each offense are so closely connected that proof of such facts is necessary to establish each offense, joinder of defendants and offenses is proper." *United States v. Gentile*, 495 F.2d 626, 630 (5th Cir. 1974). When there is no "substantial identity of facts or participants between the two offenses, there is no 'series' of acts under Rule 8(b)." *Marionneaux*, 514 F.2d at 1249. It is clear that defendants charged with two separate—albeit similar— conspiracies having one common participant are not, without more, properly joined. *See United States v. Nettles*, 570 F.2d 547, 551 (5th Cir. 1978) ("When, as here, the connection between different groups is limited to a few individuals common to each but those individuals commit separate acts which involve them in separate offenses *with no common aim*, then the requisite substantial identity of facts or participants is not present.") (emphasis added); *Marionneaux*, 514 F.2d at 1248–49. Clearly, similarity of acts alone is insufficient to indicate that a series of acts exists. The Government concedes as much, and does not purport to argue that Counts III and IV would be properly joined in the absence of Count V.

In the instant case, however, we are not faced with the joinder of two separate and distinct conspiracies and nothing more. Rather, the indictment also included Count V—the substantive RICO count under which both Counts III and IV were alleged as predicate acts.[15] To properly discuss the

---

**15.** Count III was charged as predicate act A under the RICO count, and Count IV was charged as predicate act B.

application of Rule 8(b) to this case, therefore, a brief examination of the RICO statute is necessary.

██ The RICO count charged that the four defendants violated 18 U.S.C.A. § 1962(c) [16] by conducting the affairs of the Sheriff's Office through a pattern of racketeering activity. Engaging in a "pattern of racketeering activity" requires at least two acts of racketeering within a ten-year

16. For the text of section 1962(c), see note 10 *supra.*

17. Section 1961(5) defines "pattern of racketeering activity" as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

18. Section 1961(1) defines racketeering activity as follows:

(1) "Racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on pay-

period.[17] Finally, racketeering activity is expressly defined to include only certain types of conduct,[18] including acts indictable under 18 U.S.C.A. § 1511. Here, the Cantrell's game conspiracy (Count III) and the fairgrounds conspiracy (Count IV) were each alleged to constitute one of the required two acts of racketeering activity necessary for the substantive RICO violation.[19] Including both conspiracies as predi-

ments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States . . . .

19. The question whether § 1961(1), which defines racketeering activity, includes as racketeering activity conspiracies to commit the substantive offenses listed therein has been largely unaddressed in this Circuit. *See United States v. Martino*, 648 F.2d 367, 400 (5th Cir. 1981) (conspiracy to commit mail fraud was not specifically included in § 1961(1)(B) as an act of racketeering activity; consequently, it cannot serve as a predicate offense); *United States v. Weisman*, 624 F.2d 1118, 1123–24 (2d Cir.) ("[W]e think that conspiracy can properly be charged as a predicate act of racketeering under RICO, at least when it involves any of the substantive offenses listed in section 1961(1)(D). . . . [The language in that provision] is certainly broad enough on its face to include conspiracies involving securities and bankruptcy fraud and drug related offenses. The deletion of conspiracy from earlier drafts of RICO does not undermine this conclusion. . . . [T]he alterations of section 1961(1) are most logically interpreted as an attempt to restrict the conspiracies chargeable as predicate offenses to those involving offenses listed in subsection (D)."), *cert. denied,* —— U.S. ——, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980). Whether or not conspiracies that are not specifically listed in subsections A through C of § 1961(1) can serve as predicate acts, § 1961(1)(B) provides in part that racketeering activity means "any act which is indictable under . . . section 1511 [of title 18, United States Code] . . . ." Section 1511 prohibits conspiracy to obstruct the enforcement of the criminal laws of a State with the intent to facilitate an illegal gambling business. *See* note 7 *supra.* Thus, the conspiracies charged in Counts III and IV are properly listed as predicate acts under the substantive RICO count.

cate acts under the substantive RICO count served as an allegation that the purpose of both conspiracies was to conduct the affairs of the Sheriff's Office through a pattern of racketeering activity.

█ It is well settled that the joinder of otherwise separate acts may be allowed when the acts are properly linked by means of a conspiracy charge. The conspiracy charge can serve to provide the common nexus between the acts that is necessary in order to find that those acts are part of a series of acts or transactions. Indeed, the defendants here admit that had a RICO *conspiracy* count been charged, the joinder of Counts III and IV would have been proper.[20] They contend, however, that since only a RICO *substantive* count was charged in addition to the two allegedly unrelated conspiracies, joinder was improper. We must reject the reasoning of this argument. It is true that a RICO conspiracy count can provide the connexity between two otherwise unrelated conspiracies necessary to satisfy the requirements of Rule 8(b). A conspiracy charge, however, is not the only way to establish that acts which appear to be separate are actually part of a series of acts or transactions. When otherwise separate offenses are charged as predicate acts of a substantive RICO count, they may be related to each other in such a way as to satisfy Rule 8(b). Just as a RICO conspiracy charge can provide an overall connection allowing the joinder of otherwise unrelated acts, a RICO substantive count can provide an overall connection that will allow the joinder of seemingly unrelated acts.

In reaching the conclusion that a RICO substantive count can provide the connexity necessary to satisfy Rule 8(b) with respect to two facially unrelated conspiracies, we find this Court's reasoning in *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), instructive. The Court in *Elliott* addressed the question whether diverse criminal activities that could not have been joined as a single conspiracy under the law as it existed prior to the enactment of the RICO statute could be joined as a conspiracy to violate a substantive RICO provision. In *Elliott*, this Court stated, "[W]e are convinced that, through RICO, Congress intended to authorize the single prosecution of a multi-faceted, diversified conspiracy by replacing the inadequate 'wheel' and 'chain' rationales with a new statutory concept: the enterprise." *Id.* at 902. The *Elliott* Court concluded that under pre-RICO conspiracy concepts, the diverse criminal activities that had taken place in that case could not have been joined in a single conspiracy charge:

> The activities allegedly embraced by the illegal agreement in this case are simply too diverse to be tied together on the theory that participation in one activity necessarily implied awareness of others. Even viewing the "common objective" of the conspiracy as the raising of revenue through criminal activity, we could not say, for example, that Foster, when he helped to conceal stolen meat, had to know that J.C. was selling drugs to persons unknown to Foster, or that Delph and Taylor, when they furnished counterfeit titles to a car theft ring, had to know that the man supplying the titles was also stealing goods out of interstate commerce. The enterprise involved in this case probably could not have been successfully prosecuted as a single conspiracy under the general federal conspiracy statute, 18 U.S.C. § 371.

*Id.* (footnote omitted). The Court concluded that, although the activities could not have been joined as a single conspiracy charge prior to RICO, they could be joined as a RICO conspiracy. According to the *Elliott* Court, RICO permits the inference

---

**20.** Several Fifth Circuit cases have rejected claims of misjoinder under Rule 8(b) when the indictment charged both RICO conspiracy and RICO substantive counts. *See United States v. Stratton*, 649 F.2d 1066, at 1074 n.8 (5th Cir. 1981); *Martino*, 648 F.2d at 385; *United States v. Bright*, 630 F.2d 804, 812–13 (5th Cir. 1980). We have not, however, been directed to any discussion of Rule 8(b) joinder in Fifth Circuit cases in which only a RICO substantive count and no RICO conspiracy count was charged.

of a common objective from the commission of diverse crimes by apparently unrelated individuals by "creating a substantive offense which ties together these diverse parties and crimes." *Id.* Thus, in *Elliott*, all the highly diversified activities were connected by their common aim—to violate the substantive RICO provision. In that case there was a single conspiracy characterized by an agreement to participate directly and indirectly in the affairs of the enterprise by committing two or more predicate crimes.

█ In the case before this Court, we are not concerned with whether multiple activities that could not have been joined as a single conspiracy prior to RICO can now be joined as a RICO *conspiracy.* Rather, we are faced with the question whether two separate conspiracies that would not have lent themselves to joinder in a single indictment prior to RICO can be included in one indictment and tried together when a substantive RICO offense citing both conspiracies as predicate acts is also charged. As the *Elliott* Court concluded, the enterprise supplies a unifying link between all the predicate acts charged, since all the predicate acts must be committed in the conduct of the affairs of an enterprise. Here, Count V (the substantive RICO offense) charged that all defendants did conduct and participate in the conduct of the affairs of an enterprise (the Sheriff's Office) by committing two or more predicate crimes. Each conspiracy charged by Counts III and IV constituted one of the predicate crimes. Thus, each conspiracy was aimed at participating in the affairs of the enterprise. The acts directed at conducting the affairs of the Sheriff's Office through a pattern of racketeering activity were related to each other and were part of a series of acts or transactions. The common goal—conducting the affairs of the Sheriff's Office by means of a pattern of racketeering—provides a sufficient identity of facts to satisfy Rule 8(b). In this case, therefore, when Counts III and IV were charged separately and as predicate acts of a substantive RICO offense, there exists a sufficient interrelationship between the offenses charged to satisfy the requirements of Rule 8(b).

To reach a different conclusion would not serve the purposes of Rule 8(b). "The purpose of the rule is, in the interest of convenience and expediency, to encourage joint trials while at the same time limiting as much as possible the admission at trial of prejudicial evidence against a defendant." *Gentile,* 495 F.2d at 630. Count III simply realleges in a substantive count the allegations of predicate act A, while Count IV realleges in a substantive count the allegations of predicate act B. The same evidence used to prove predicate acts A and B are used to prove Counts III and IV. Had Counts III and IV not been alleged in the indictment, there would have been no change in the evidence offered at trial. The addition of Counts III and IV did not enable the Government to introduce any evidence that would not have been admissible under Count V. Had separate trials been required on Counts III and V on the one hand, and Counts IV and V on the other hand, two trials with substantially identical evidence would have been necessitated.

In ruling that there was no misjoinder under Rule 8(b) in this case, we follow the lead of the Second Circuit. In *United States v. Weisman,* 624 F.2d 1118 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980), defendant Weisman was convicted of (1) operating the Westchester Premier Theatre through a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962(c); (2) nine counts of fraud in the sale of securities; (3) nine counts of bankruptcy fraud; (4) one count each of conspiracy to commit securities fraud and bankruptcy fraud; and (5) one count of endeavoring to obstruct a grand jury investigation. Defendant Cannatella was convicted of (1) bankruptcy fraud and (2) conspiracy to commit bankruptcy fraud. Cannatella argued that he was improperly joined under Rule 8(b) with the other defendants. The Second Circuit held that the RICO count provided "a sufficient nexus between the counts of securities fraud and bankruptcy fraud to establish that they were part of the 'same series of acts or

transactions' . . . ." *Id.* at 1129. The court reasoned as follows:

Rule 8(b) permits the joint trial of defendants who are "alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." This requirement is met by the RICO count of the indictment. As previously noted, the jury could properly find that Weisman engaged in a "pattern of racketeering activity" that included, but was not limited to, the predicate acts of bankruptcy fraud with which Cannatella was charged. If, as we have already concluded, the acts of bankruptcy fraud could properly be considered part of a "pattern of racketeering activity," we see no reason why they could not similarly constitute part of a "series of acts or transactions constituting an offense" within the meaning of Rule 8(b). Indeed, a construction of Rule 8(b) that required a closer relationship between transactions than that necessary to establish a "pattern of racketeering activity" under RICO might possibly prohibit joinder in circumstances where Congress clearly envisioned a single trial.

*Id.* Thus, the *Weisman* court held that the joinder of Cannatella with the other defendants did not violate Rule 8(b), even though Cannatella was indicted only on the bankruptcy fraud charges and not on the unifying RICO count.

We are also supported in our decision by *United States v. Bright*, 630 F.2d 804 (5th Cir. 1980). In that case, the eight-count indictment charged a number of defendants with both conspiracy and substantive racketeering offenses, interstate travel in aid of racketeering, extortion and receiving payoffs under color of law, and obstruction of justice. In response to the defendants' contention that the trial court improperly denied defendants' motion to sever, the *Bright* Court stated:

It is true that the defendants in this case were alleged to have committed different predicate crimes. Indeed, if this was not a RICO case, the defendants would have a valid argument of misjoin-

der—those defendants alleged to have extorted money from tonk operators hardly engaged in the same "series of acts or transactions" as the defendants who allegedly paid bribes to the sheriff to operate as a monopoly. The gist of the RICO offense, however, is that the defendant, through a pattern of predicate crimes, furthered a racketeering enterprise. The offense charged here is not the commission of the predicate crimes, but the furthering of the enterprise. *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Thus viewed, it is clear the defendants were alleged to have participated in the same offense and joinder was not improper under Rule 8.

*Id.* at 812–13. Similarly, in the instant case, when all the offenses were alleged to have been committed in furtherance of a racketeering enterprise, joinder was proper under Rule 8(b) even in the absence of a RICO conspiracy charge.

**B.** *Joinder of Defendants Under Rule 14*

Defendants argue that, in the event this Court finds that there was no misjoinder of defendants under Rule 8(b), then joinder was prejudicial under Fed.R.Crim.P. 14. Rule 14 provides in pertinent part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Unlike Rule 8(b), severance under Rule 14 is a matter within the discretion of the trial court and denial of a motion to sever is reversible only for abuse of discretion. *United States v. Park*, 531 F.2d 754, 761 (5th Cir. 1976). To warrant severance under Rule 14, the burden is upon the defendant to show clear prejudice. The general test is:

[W]hether under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to

follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted. *Peterson v. United States*, 344 F.2d 419, 422 (5th Cir. 1965) (footnotes omitted), *quoted in United States v. Martino*, 648 F.2d 367, 385 (5th Cir. 1981). The defendants have a "heavy burden in demonstrating prejudice when a severance is not granted." *United States v. Crockett*, 514 F.2d 64, 70 (5th Cir. 1975).

▇▇▇▇ After a careful and thorough review of the record, we cannot say that the trial court abused its discretion in denying defendants' motions to sever. The evidence was neither so complex nor so confusing that the jury could not separate the evidence and properly apply it only to those against whom it was offered.[21]

### C. Joinder of Count VI

▇▇▇ Count VI, charging a civil rights violation by Sheriff Welch, was severed on the second day of trial. The only reference made to this count in the presence of the jury was the following remark made by the prosecutor in his opening statement:

> Count VI is a civil rights violation against Sheriff Welch only. We will

show you, and prove to you, the events that happened at that particular time was that Sheriff Welch came in drunk to his office late one night and in the presence of two or more Deputies took his pistol to an unresisting prisoner, and slashed him about the face with the barrel, causing a vast amount of blood to be lost by the prisoner, in violation of the Civil Rights laws of the United States.

No evidence was received on this count prior to its severance. At the close of all the evidence, the trial court judge gave the jury the following cautionary instruction:

> You are instructed that for legal reasons, about which you are not to speculate, the Court has determined that Counts I, II, and VI, and Paragraph "O" of Count V, should not be tried in this trial. You are not to consider these Counts when deliberating on Counts III and IV, and the remainder of Count V, and you are to consider only Counts III and IV and the remainder of Count V, and the evidence which is related to those Counts, in arriving at your verdict.

Defendants argue that they were prejudiced by the late severance of Count VI and that they are, therefore, entitled to a reversal of their convictions. Defendants' conclusory contention that "the belated severance of this count only enhanced the prejudicial effect of an indictment that was already infested with misjoinder" will not satisfy their burden of showing clear prejudice. In the context of the entire record,

---

**21.** In addition to the contentions of misjoinder, several defendants also claim that the indictment was multiplicious. They contend that by including in a single indictment two separate conspiracies on the one hand, and a substantive RICO count that included both conspiracies as predicate acts on the other hand, the Government was able to "secure the imposition of three separate sentences for conduct that was in every way identical." This argument is without merit. The charged offenses—the Count III conspiracy, the Count IV conspiracy, and the Count V RICO charge—were each separate offenses; thus, the inclusion of the three counts in a single indictment did not result in a multiplicious indictment. *See United States v. Boylan*, 620 F.2d 359 (2d Cir.), *cert. denied*, — U.S. —, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980); *United States v. Aleman*, 609 F.2d 298, 306–07 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Rone*, 598 F.2d 564, 571–72 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed. 780 (1980). Moreover, the defendants argue that it is the inclusion of Counts III and IV in the same indictment with Count V that raises the multiplicity problem. Even if the joinder of these counts was multiplicious, no reversal is required since the sentences imposed on Counts III and IV in all cases are to run concurrently with the sentences imposed on Count V. *See United States v. Lentz*, 624 F.2d 1280, 1289 (5th Cir. 1980), *cert. denied*, — U.S. —, 101 S.Ct. 1696, 68 L.Ed.2d 194 (1981).

the timing of the severance of Count VI did not constitute prejudicial error requiring a new trial.

### III. *Sufficiency of the Evidence and of the Indictment*

#### A. *Welch*

██ Welch contends that the evidence was insufficient to sustain his conviction on the two conspiracies charged by Counts III and IV. These counts charged Welch with two separate conspiracies to obstruct the enforcement of the criminal laws of the State of Texas with the intent to facilitate an illegal gambling business pursuant to 18 U.S.C.A. § 1511. Under this statute, it is part of the Government's burden to prove, *inter alia,* that there was a conspiracy, the object of which was to obstruct the enforcement of the criminal laws of Texas with the intent to facilitate an illegal gambling business,[22] and that Welch was a member of that conspiracy. *See United States v. Cylkouski,* 556 F.2d 799, 803 (6th Cir. 1977). "The essence of conspiracy is the agreement to engage in concerted unlawful activity." *Grassi,* 616 F.2d at 1301; *United States v. Suarez,* 608 F.2d 584, 586 (5th Cir. 1979).[23] "There must be proof beyond reasonable doubt that a conspiracy existed, that the accused knew of it, and that the accused, with that knowledge, voluntarily became a part of it." *United States v. Gutierrez,* 559 F.2d 1278, 1280 (5th Cir. 1977). *See United States v. Malatesta,* 590 F.2d 1379, 1381 (5th Cir.) (en banc), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979) & 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979). "[P]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'" *Id.* (quoting *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)). The standard for review on appeal is whether there is substantial evidence to support the conspiracy conviction when the evidence is viewed in the light most favorable to the Government. *Malatesta,* 590 F.2d at 1382.

██ With respect to Count III, Welch argues that, although the Government might have shown that Welch knew of the existence of Cantrell's game, there was no evidence that Welch *agreed* to facilitate the game. It is clear that mere association with conspirators or knowledge of a conspiracy is insufficient to convict a defendant of conspiracy; rather, the Government must demonstrate that the defendant agreed with others that together they would accomplish the unlawful object of the conspiracy. *Grassi,* 616 F.2d at 1301. Nei-

---

**22.** A gambling business in violation of Texas laws must be alleged and proved before there is a violation of § 1511. *See United States v. Thaggard,* 477 F.2d 626, 631 (5th Cir.), *cert. denied,* 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973); *United States v. Garrison,* 348 F.Supp. 1112, 1120–22 (E.D.La.1972). Here, the pertinent Texas law states:

§ 47.03 Gambling Promotion

(a) A person commits an offense if he intentionally or knowingly does any of the following acts:

(1) operates or participates in the earnings of a gambling place;

(2) receives, records, or forwards a bet or offer to bet;

(3) for gain, becomes a custodian of anything of value bet or offered to be bet;

(4) sells chances on the partial or final result of or on the margin of victory in any game or contest or on the performance of any participant in any game or contest or on the result of any political nomination, appointment, or election or on the degree of success of any nominee, appointee, or candidate; or

(5) for gain, sets up or promotes any lottery or sells or offers to sell or knowingly possesses for transfer, or transfers any card, stub, ticket, check, or other device designed to serve as evidence of participation in any lottery.

(b) An offense under this section is a felony of the third degree.

Tex.Penal Code Ann. tit. 10, § 47.03 (Vernon 1974).

Section 1511, in addition, contains a number of other requirements that constitute essential elements of the offense. *See* note 7 *supra.*

**23.** Under some federal statutes, agreements to do unlawful acts alone are proscribed; other federal statutes require proof of an agreement and an overt act in furtherance of it. The provisions of § 1511 require at least one conspirator to do an act to effect the object of the conspiracy.

ther direct evidence nor a formal agreement is necessary, however, to establish a conspiracy. *United States v. Barrera*, 547 F.2d 1250, 1256 (5th Cir. 1977). Evidence of knowledge and association, in conjunction with other circumstantial evidence, can prove an agreement to join a conspiracy. *Grassi*, 616 F.2d at 1301–02. Where knowledge of a conspiracy and an intentional act in furtherance thereof can be proved, the jury may reasonably infer the existence of an agreement. A person's acts can create an inference concerning what he has agreed to do and, therefore, an agreement to join a criminal conspiracy may be inferred from the performance of acts that further its purpose.[24] *Marx*, 635 F.2d at 439 ("The defendant's assent to a conspiracy may be inferred from acts which furthered the purpose of the conspiracy."); *United States v. Morado*, 454 F.2d 167, 174 (5th Cir.) ("[P]roof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence—ordinarily the acts and conduct of the alleged conspirators themselves."), *cert. denied*, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972). Here, Welch knew about Cantrell's game and was present at the location of the game a number of times. He ordered his men to patrol the Pat Smith place while construction was under way there to make the place a more suitable location for Cantrell's game. The evidence indicates that Welch warned two would-be robbers to stay away from his game and to leave his people alone. Although the sheriff's men quelled disturbances at Cantrell's game at least twice, they never interfered with the game or closed it down. There was evidence that the sheriff received "insurance" money to protect the illegal gambling. The jury could reasonably infer—in light of Welch's knowledge and his intentional acts in furtherance of the conspiracy—that Welch agreed to engage in the obstruction of the enforcement of the criminal laws of Texas with the intent to facilitate Cantrell's game. Viewing the evidence in the light most favorable to the Government, and accepting all reasonable inferences that support the jury verdict, we find that there is substantial evidence to support the jury verdict on Count III.

Welch also contends that the evidence is insufficient to sustain his conviction on Count IV involving a conspiracy with intent to facilitate gambling at the fairgrounds. The same principles noted above apply to this count. Welch argues that, while the Government might have proved the existence of illegal games at the fairgrounds, it failed to prove the existence of a conspiracy or the commission of any acts that would obstruct the enforcement of the law. The evidence with respect to this charge indicated that through the concession manager Seymour Schlar, the sheriff received money from the gambling operators in 1977 and 1978. Each year the same members of the Sheriff's Office—who also received money from Schlar—regularly patrolled the midway area of the fair. They protected the open and obvious gambling that occurred on the midway. Although they received complaints from people who had lost money at booths conducting gambling games, they never closed down any of those gambling games. Welch himself was informed of a number of gambling complaints, yet he never took any action to stop the illegal gambling taking place on the midway. There is proof beyond a reasonable doubt that a

---

**24.** This general principle of conspiracy law—that actions taken by a person can give rise to an inference of an agreement—has, of course, also been recognized in the context of a RICO conspiracy.

> To be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement *to participate*, directly or indirectly, in the affairs of an enterprise *through the commission of two or more predicate crimes*. One whose agreement with the members of an enterprise did not include this vital element cannot be convicted under the Act. Where, as here, the evidence establishes that each defendant, over a period of years, committed several acts of racketeering activity in furtherance of the enterprise's affairs, the inference of an agreement to do so is unmistakable.

*Elliott*, 571 F.2d at 903 (emphasis in original). *See Martino*, 648 F.2d at 383; *Bright*, 630 F.2d at 834.

conspiracy existed. There is, in addition, substantial evidence that Welch knew of this conspiracy and voluntarily became part of it. This Court cannot say that the jury verdict was improper.

Finally, Welch contends that the evidence presented at trial was insufficient to sustain a conviction on Count V—the substantive RICO offense. This Court has recently stated that five elements comprise a substantive RICO charge:

> The government must prove (1) the existence of the enterprise; (2) that the enterprise affected interstate commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that he participated in the conduct of the affairs of the enterprise; and (5) that he participated through a pattern of racketeering activity.

*Martino*, 648 F.2d at 394. Welch maintains first that the Government failed to show that Welch engaged in a pattern of racketeering activity; *i. e.*, Welch claims that there was insufficient evidence to conclude that he had committed two predicate acts. Second, Welch argues that the Government failed to show that he participated in the conduct of the affairs of the enterprise *through* a pattern of racketeering activity.

**1. Commission of Two Predicate Acts**

To be convicted on a section 1962(c) RICO charge, the evidence must show that the defendant participated in the affairs of the enterprise through a pattern of racketeering activity. This requires the commission of at least two predicate crimes. Welch was charged with fourteen predicate acts (although one was later severed), including conspiracy to obstruct the enforcement of the criminal laws of Texas with the intent to facilitate Cantrell's game and conspiracy to obstruct the enforcement of the criminal laws of Texas with the intent to facilitate the gambling at the fairgrounds. We have already held that there was sufficient evidence to support Welch's conviction on these counts; consequently, the Government sustained its burden of proving that Welch engaged in a pattern of racketeering activity.

In addition to the two acts of racketeering discussed above, the indictment also listed eleven counts of bribery as predicate acts committed by Welch.[25] Welch raises two arguments with respect to these bribery charges. First, he claims that if the offenses were acts of bribery, they fell within a different subsection of the Texas bribery statute than was charged in the indictment; consequently, the indictment was defective. Second, Welch maintains that the offenses were not acts of bribery at all, but were instead only misdemeanors that could not properly serve as predicate acts for a RICO conviction. Welch's contentions are without merit.

Welch notes that the Government charged him with violating Tex. Penal Code Ann. tit. 8, § 36.02(a)(1) (Vernon Supp. 1980), which provides:

> § 36.02. Bribery
>
> (a) A person commits an offense if he intentionally or knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another:
>
> (1) any pecuniary benefit as consideration for the recipient's . . . exercise of discretion as a public servant . . . .

Welch argues that the predicate acts of bribery charged in Count V were not acts that were within the sheriff's *discretion* to permit. Rather, Welch claims that the indictment should have charged that these acts violated section 36.02(a)(3), which provides:

> (a) A person commits an offense if he intentionally or knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another:
>
> . . . .
>
> (3) any benefit as consideration for a violation of a duty imposed by law on a public servant or party official.

Welch concludes that since the indictment failed to charge the proper offense under

---

**25.** One of those counts was severed after the start of trial.

the bribery statute, the indictment was defective and his conviction must be reversed.

■ Even if the acts of bribery charged in the indictment did cite the wrong subpart of the bribery statute, this would not require reversal of the conviction. Although the RICO statute defines racketeering activity in part by making reference to state law violations, the gravamen of the racketeering charge is a violation of *federal* law. "Courts construing the racketeering statutes have found that the references to state law serve a definitional purpose, to identify generally the kind of activity made illegal by the federal statute." *United States v. Salinas,* 564 F.2d 688, 690 (5th Cir. 1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 800 (1978). "[T]he reference to state law in the federal statute is for the purpose of defining the *conduct* prohibited and for the purpose of supplementing, rather than pre-empting, state gambling laws." *Id.* at 692 (quoting *United States v. Revel,* 493 F.2d 1, 3 (5th Cir. 1974), *cert. denied,* 421 U.S. 909, 95 S.Ct. 1559, 43 L.Ed.2d 774 (1975)) (emphasis in original). *See United States v. Brown,* 555 F.2d 407, 418 n.22 (5th Cir. 1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978); *United States v. Crockett,* 506 F.2d 759 (5th Cir.) (in context of prosecution pursuant to 18 U.S.C.A. § 1955, trial court did not err in failing to give jury the Georgia statutory language making gambling illegal), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975).

In *Salinas,* two defendants had been charged with collecting unlawful debts for an enterprise engaged in interstate commerce in violation of 18 U.S.C.A. § 1962(c). Section 1961(6) defines an unlawful debt as one incurred in violation of state laws against gambling *and* the business of gambling. The pertinent state law—that of Texas—proscribed gambling, but did not address the "business of gambling." The *Salinas* Court concluded that:

> [I]t was not the intent of Congress to attack gambling only in states that classify gambling along the federal model. The reason for the Congressional conjunctive requirement that a debt be incurred in connection with gambling and with the business of gambling was that it sought to punish only large scale gambling operations involving "organized crime" as contrasted with small time gambling.

564 F.2d at 691. Similarly, the Third Circuit affirmed the conviction of defendants on racketeering charges even though they had previously been acquitted in state court of offenses that were charged as acts of racketeering for purposes of the RICO violation. The court stated that, "The state offenses referred *to* in the federal act are definitional only; racketeering, the federal crime, is defined as a matter of legislative draftsmanship by reference to state law crimes." *United States v. Frumento,* 563 F.2d 1083, 1087 (3d Cir. 1977), *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1256, 1258, 55 L.Ed.2d 775 (1978), *quoted in Salinas,* 564 F.2d at 692. The *Frumento* court went on to say:

> In arguing that the acts of these defendants were not "chargeable under State law and punishable by imprisonment for more than one year" since both defendants had been acquitted in state court, the dissent misconstrues this definitional purpose. Section 1961 requires, in our view, only that the *conduct* on which the federal charge is based be typical of the serious crime dealt with by the state statute, not that the particular defendant be "chargeable under State law" at the time of the federal indictment.

563 F.2d at 1087 n.8A (emphasis in original). *See United States v. Malatesta,* 583 F.2d 748, 757–58 (5th Cir. 1978), *vacated on other grounds,* 590 F.2d 1379 (5th Cir.) (en banc), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979) & 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979).

■ It follows from the above-stated principles that whether Welch's conduct violated Tex. Penal Code Ann. tit. 8, § 36.-02(a)(1) (Vernon Supp. 1980) or *id.* § 36.-02(a)(3), it is precisely the type of serious conduct contemplated by the RICO statute as actionable as an act of racketeering. Any possible miscitation of the pertinent

subsection of the Texas bribery statute did not constitute reversible error.[26]

■ Welch's second argument is that the acts of bribery charged in the indictment were not actually acts of bribery at all; rather, they were acts of official misconduct under Tex. Penal Code Ann. tit. 8, § 39.01(a)(1)–(4) (Vernon 1974). This argument, if true, could potentially have more serious ramifications than a mere possible miscitation of the proper subsection of the Texas bribery statute, since offenses under this section are misdemeanors and, as such, cannot serve as predicate crimes for purposes of a RICO conviction. Section 39.01 provides in part:

(a) A public servant commits an offense if, with intent to obtain a benefit for himself or to harm another, he intentionally or knowingly:

(1) commits an act relating to his office or employment that constitutes an unauthorized exercise of his official power;

(2) commits an act under color of his office or employment that exceeds his official power;

(3) refrains from performing a duty that is imposed on him by law or that is clearly inherent in the nature of his office or employment;

(4) violates a law relating to his office or employment . . . .

Since we have already decided, however, that the Government sustained its burden of proving Welch's involvement in the two predicate acts necessary to support his RICO conviction—the Count III conspiracy (alleged as predicate act A) and the Count IV conspiracy (alleged as predicate act B)—proof of Welch's involvement in the alleged acts of bribery is not necessary in order to affirm Welch's conviction on the RICO charge. However, Welch maintains that the improper inclusion of the bribery charges in the indictment, and the evidence offered at trial to substantiate these acts, was prejudicial to Welch inasmuch as the sole effect and purpose of the so-called bribery charges and the corresponding evidence was to present Welch as a bad person generally.

Welch's argument does not necessitate a reversal of his conviction. First, it appears that the acts charged in the indictment against Welch do fall within the provisions

---

**26.** Even apart from the above discussion, under the Federal Rules of Criminal Procedure, the alleged citation of the wrong subpart of the Texas bribery statute in this case would not require reversal of the conviction. Fed.R. Crim.P. 7(c)(3) provides as follows:

Harmless Error. Error in the citation or its omission shall not be ground for dismissal of the indictment or information or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.

It is the rule in this Circuit that where "the indictment contains the elements of the offense charged and sufficiently apprises the defendant so that he will not be misled while preparing his defense" and where "the defendant is protected against another prosecution for the same offense," the indictment is not insufficient. *United States v. Welliver*, 601 F.2d 203, 207 (5th Cir. 1979). That an indictment contains a miscitation of a statute is not grounds for dismissing the indictment when the defendant is not misled or prejudiced thereby. *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 464–65, 85 L.Ed. 788 (1941); *United States v. Garner*, 529 F.2d 962, 966 (6th Cir.), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2630, 49 L.Ed.2d 376 (1976) & 429 U.S. 850, 97 S.Ct. 138, 50

L.Ed.2d 124 (1976). Here, the facts alleged in the indictment clearly charged Welch with a violation of the Texas bribery statute; Welch was not misled or prejudiced by any possible miscitation of the statute—indeed, he does not even contend that he was either prejudiced or misled by the possible miscitation of the statute. The indictment was proper since it "put the defendants on notice of the offenses charged, advised them of the facts giving rise to those offenses, and furnished an adequate foundation for a plea of double jeopardy in the event of a future prosecution of the defendant for the same conduct." *United States v. L'Hoste*, 609 F.2d 796, 801 (5th Cir.), *cert. denied*, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980). *See United States v. Uni Oil, Inc.*, 646 F.2d 946, 954 (5th Cir. 1981) ("Despite the government's failure to allege each element of commercial bribery separately, the indictment contains copious facts which adequately apprise the defendants of the nature of the charge against them. Therefore, the indictment's deficiency is not material."). Finally, any variance that might have existed between the indictment and the proof at trial did not affect the substantial rights of the parties.

of section 36.02(a)—the Texas bribery statute. Second, even if the offenses were acts of official misconduct, we cannot say that the inclusion of these charges in the indictment and the evidence produced at trial to support these charges was so prejudicial as to require reversal.

### 2. Participation in the Conduct of the Affairs of the Enterprise Through a Pattern of Racketeering Activity

■ Welch maintains that the Government made no showing that the activities of the Sheriff's Office were conducted *through* the acts of racketeering alleged as predicate offenses. To support this contention, Welch argues that no proof was offered that the alleged predicate offenses "promoted or advanced" the affairs of the named enterprise and that the trial court declined to instruct the jury that such promotion or advancement was necessary to a RICO conviction. In addition, Welch notes that the Government's proof sought to show that the proceeds or benefits derived from the racketeering activities went to the individual defendants in this case and not to the Sheriff's Office.

Welch cites a recent Fourth Circuit case, *United States v. Webster*, 639 F.2d 174 (4th Cir. 1981), to support his contention that the statutory language requiring "the conduct of such enterprise's affairs *through* a pattern of racketeering" must be interpreted to require that the affairs of the enterprise be *advanced* by the racketeering. In *Web-*

ster, the enterprise was alleged to be the 1508 Club Tavern and Liquor Store, which was owned and operated by one of the defendants involved in a drug distribution network. The club was used to facilitate the drug distribution operation out of which the racketeering activity arose. The Fourth Circuit held that "the prosecution was required to prove that the 'enterprise' ... had its affairs advanced or benefitted in some fashion, direct or indirect, by the pattern of racketeering activity." *Id.* at 185–86. The court rejected the Government's argument that "the statute requires only a 'substantial nexus' between the racketeering and the conduct of the enterprise's affairs, regardless of which direction the assistance flows." *Id.* at 184. Instead, the court concluded that:

> The meaning of the word "through" suggests that, at least where the government elects to cast a § 1962(c) indictment in a form in which the "enterprise" is the legal or ostensibly legal activity, and not the racketeering activity itself, the statute should be applied in such a way as to punish where the racketeering activity advances the nonracketeering business but not where the only relation between the two consists of benefits which the racketeering activity derives from the nonracketeering enterprise.

*Id.* at 184–85.[27]

We find the reasoning of the Fourth Circuit, and its interpretation of the word

---

27. Welch also relies upon *United States v. Nerone*, 563 F.2d 836 (7th Cir. 1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978). The court in that case concluded that the Government had failed to prove that the affairs of the enterprise—Maple Manor, Inc., which rented real estate upon which mobile homes or trailers could be parked—were conducted through a pattern of racketeering. Rather, the court found that the affairs of an illegal casino operation were conducted through the mechanism of the mobile home park corporation. In its discussion, the court stated:

> On this appeal, it is clear to us that the Government has been arguing that the casino operation, which was itself arguably a prohibited enterprise ..., was facilitated through the cover of a legitimate enterprise.

This court can readily agree that the jury could infer that such was the fact. The problem with the Government's case, however, is that the indictment charged that the affairs of the mobile home park corporation, not the casino operation, were conducted through a pattern of racketeering activity. Our examination of the record leaves us with the abiding conviction that the Government never really crystalized its theory of the case. It made no attempt to show that the proceeds of the casino operation were invested in Maple Manor, Inc. Nor did it endeavor to show that gambling revenues were used by or in any way channeled into the corporation or that persons were paid out of gambling revenues to perform services for Maple Manor, Inc.

*Id.* at 851.

"through," to be unduly restrictive. The law has not previously been interpreted by this Court to require evidence that the enterprise received money or was financially advanced by the pattern of racketeering activities. Rather, all that has been required—as stated in the statute itself—is that the Government prove that the affairs of the enterprise are conducted through a pattern of racketeering activity. The *Elliott* Court has interpreted this provision to require a relation between the predicate crime and the affairs of the enterprise. That Court stated:

> We note also that the Act does not criminalize either associating with an enterprise or engaging in a pattern of racketeering activity standing alone. The gravamen of the offense described in 18 U.S.C. § 1962(c) is the conduct of an enterprise's affairs through a pattern of racketeering activity. Thus, the Act does require a type of relatedness: the two or more predicate crimes must be related to the affairs of the enterprise but need not otherwise be related to each other.

571 F.2d at 899 n.23.[28] Thus, what is required to satisfy the last element of a RICO substantive offense—that the defendant participated in the conduct of the affairs of the enterprise *through* a pattern of racketeering activity—is a relation between the predicate offenses and the affairs of the enterprise. *See Martino,* 648 F.2d at 403 ("Congress decreed that by committing two of the designated predicate crimes *related*

to the affairs of the 'enterprise,' a person participates in the enterprise and thus violates RICO.") (emphasis added). To require that the racketeering activities benefit the enterprise would impose a severe—and, in the view of this Court, congressionally unintended—restriction on the elimination of organized crime in legitimate businesses and governmental entities.[29]

The purpose of RICO is "to seek the eradication of organized crime in the United States . . . ." 18 U.S.C.A. § 1961 note (West Supp.1981). In its Statement of Findings and Purpose, Congress expressed a concern for the increasing use by organized crime of money and power "to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes." *Id.* We find no evidence that Congress did not intend section 1962(c) to reach situations in which the power and authority of a governmental entity is utilized to enable those associated with that entity to engage in racketeering. In such a situation, as in the case *sub judice,* in view of the link between the enterprise—which makes possible the racketeering activity—and the racketeering activity itself, it cannot be convincingly said that the enterprise is not being conducted through a pattern of racketeering activity. We do not believe that Congress intended virtually to insulate governmental entities, or other legitimate enterprises, which are being operated by means of racketeering activities, from prosecution under section

---

28. The *Bright* Court concluded that the requirement of a relationship between the predicate crimes and the affairs of the enterprise served to establish the existence of a *pattern* of racketeering activity. 630 F.2d at 830 & n.47. That Court did not *expressly* require such a relationship in its determination of whether the defendant participated in the affairs of the enterprise *through* a pattern of racketeering activity. *Id.* at 830–31. However, its conclusion that the final element of the RICO violation was satisfied because the pattern of racketeering activity was linked to the enterprise's affairs suggests that such a connection satisfies the requirement that the defendant participate in the affairs of the enterprise *through* a pattern of racketeering activity. *See id.*

29. The Eighth Circuit noted that:

> With [section 1961(b) and (c)], consideration must also be given to the requirement that the defendant operate "through" a pattern of racketeering activity. This element practically vanishes along with the enterprise element whenever the enterprise is defined as the association to commit the racketeering activity, but it can pose substantive limitations on prosecutorial zeal in the setting of infiltration of legitimate business.

*United States v. Anderson,* 626 F.2d 1358, 1366 n. 13 (8th Cir. 1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). We do not believe that by the use of the word "through," Congress intended to create additional limitations on the use of RICO to eradicate the infiltration of legitimate businesses by organized crime.

1962(c) by requiring that the business of the enterprise be benefitted by the racketeering activity. Instead, we conclude that by the use of the word "through," Congress intended only to require a sufficient nexus between the racketeering activities and the affairs of the enterprise.

 Though the Government's evidence indicated that the proceeds Welch received from his racketeering activities were kept by Welch for his own benefit, we have concluded that this is not dispositive of whether the affairs of the enterprise were conducted through a pattern of racketeering activity. Here, there is a clear connection between the enterprise—the Sheriff's Office—and the predicate acts committed by Sheriff Welch.[30] Welch utilized the power of the Sheriff's Office for personal gain. The Sheriff's Office was conducted through a system of discretionary law enforcement—its members and those associated with it continuously and repeatedly failed to enforce the law in return for pecuniary benefits. Without the power and authority of the Sheriff's Office, the defendants in this case (who were all either members of the Sheriff's Office or were associated with the Sheriff's Office in some way) would have been unable to enter into agreements to refuse to enforce the law or to receive payments for their refusal to enforce the law. The offenses were a part of a scheme to use the Sheriff's Office for illicit profit-making activities. The evidence in this case shows that Welch did participate in the affairs of the Sheriff's Office through a pattern of racketeering activity. The conclusion reached by the *Bright* Court is equally applicable here:

> The final element of a RICO violation is proof that the defendant participated in the affairs of the enterprise *through* a pattern of racketeering activity....

[T]his case is distinguishable from those where the pattern of racketeering activity was not linked to the alleged enterprise's affairs. *See United States v. Mandel*, 591 F.2d 1347, 1376 (4th Cir. 1979); *United States v. Nerone*, 563 F.2d 836, 850–52 (7th Cir. 1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978). There was sufficient evidence from which a jury could find [the defendant] participated in the affairs of the Sheriff's office by bribing the Sheriff. *Id.* 630 F.2d at 830–31 (emphasis in original).

### B. Satterwhite

 Satterwhite argues first that the evidence was insufficient to support his conviction on the Count III conspiracy charge. He claims that the evidence does not show that he conspired with others to obstruct the enforcement of the criminal laws of Texas with intent to facilitate illegal gambling. There was evidence at trial that before Cantrell's game moved to its new location, county employees using county equipment serviced the private roads leading to the Foster farm. After Cantrell decided to change the location of the game to the Pat Smith place, but before any gambling had taken place at the new location, Satterwhite arranged for county employees working on county time and using county equipment to build a parking lot of slag behind the Pat Smith house and to widen the driveway at the house. Both the construction of the parking lot and the widening of the driveway were initiated at the request of Cantrell. One of Satterwhite's county employees, Garland Grimes, testified at trial that at a meeting with Cantrell and Satterwhite (which took place after the FBI raided Cantrell's game), he was told to say that Cantrell had paid him to haul the slag and that Satterwhite did not know about

**30.** Similarly, there is a substantial connection between the Sheriff's Office and the predicate acts committed by Cochran and Cashell. Thus, Cochran and Cashell also participated in the affairs of the enterprise *through* a pattern of racketeering activity. It is of no moment that Cashell was not employed by the Sheriff's Office. " 'The substantive proscriptions of the RICO statute apply to insiders *and outsiders* —those merely "associated with" an enterprise—who participate directly *and indirectly* in the enterprise's affairs through a pattern of racketeering activity.' " *Martino*, 648 F.2d at 394 (quoting *Elliott*, 571 F.2d at 903) (emphasis in original).

the arrangement. In fact, the testimony shows that Satterwhite had paid Grimes $60.00 with money from Cantrell to do the job.[31] This evidence provides a sufficient basis for the jury to conclude beyond a reasonable doubt that Satterwhite knew of the conspiracy and intentionally performed acts in furtherance of it. Thus, the jury could reasonably have inferred the existence of an agreement. Satterwhite's conviction on the Count III conspiracy is therefore affirmed.

Satterwhite also contends that the evidence was insufficient to support his conviction on Count V of the indictment—the RICO charge. Satterwhite argues that the Government failed to prove that Satterwhite engaged in a pattern of racketeering. He maintains that the evidence fails to show that he committed two predicate acts. Satterwhite was only charged with two predicate acts. The first was a conspiracy to obstruct the enforcement of the criminal laws of the State of Texas with intent to facilitate an illegal gambling business—the Count III conspiracy involving Cantrell's game. We have already decided above that the evidence was sufficient to support Satterwhite's conviction on this count; consequently, the Government sustained its burden of proving the first predicate act. Satterwhite was, in addition, charged with a conspiracy to murder. If the evidence was insufficient to conclude that Satterwhite

was a knowing participant in the murder conspiracy, then Satterwhite's conviction on the RICO charge was improper because his participation in two predicate acts was not proved.

We conclude that the evidence was insufficient to prove Satterwhite's involvement in the murder conspiracy.[32] The only evidence of Satterwhite's involvement in the conspiracy was that Satterwhite allowed Welch and his men to use Satterwhite's County Barn as the location for a stakeout. He helped Welch's men arrange the stakeout by bringing a safe and some bales of hay to the Barn. He drove three deputies to the Barn in a county dump truck, and unlocked the office in which the deputies' weapons had been placed so that the deputies would have access to their weapons. This evidence is insufficient to conclude that Satterwhite knew of the conspiracy, that he intentionally performed acts in furtherance of the conspiracy, or that he agreed to take part in the conspiracy. Indeed, the evidence might be construed as fully consistent with the conclusion that Satterwhite believed that members of the Sheriff's Office intended to set up a legitimate stakeout to apprehend several criminals. Captain Don Hale, who was in charge of planning and setting up the stakeout, testified at trial that he did not know whether Satterwhite was aware of the purpose of the plan. There is no indication

**31.** Three other county employees also worked on the parking lot; one of them was paid $40.00 by Satterwhite for his work.

**32.** It is not yet settled whether a charge of conspiracy to murder is a proper predicate act for a RICO charge. Section 1961(1)(A) lists "any act or threat involving murder" as racketeering activity. The Second Circuit has decided that conspiracies to commit offenses listed in § 1961(1)(D) can properly be charged as predicate acts of racketeering. *Weisman*, 624 F.2d at 1123–24. The Second Circuit distinguished between the language of subsection D, which includes as racketeering activity "any *offense*" involving certain crimes, and the language of subsections A–C, which appeared to that circuit to be somewhat more limited. Subsection A includes as racketeering activity "any act or threat *involving*" (emphasis added) certain crimes; subsection B refers to "any act which is indictable" under certain provisions of

Title 18 of the United States Code; and subsection C refers to "any act which is indictable" under certain provisions of Title 29 of the United States Code. There is merit to the argument that the language of subsection A is as broad and inclusive as the language of subsection D. If conspiracy to commit a subsection D offense can serve as a predicate act for a RICO charge, then conspiracy to commit a subsection A offense should also be able to serve as a predicate act. The language of subsection A itself—which includes "any act or threat involving murder"—appears to contemplate a conspiracy to commit murder. A conspiracy to commit murder is an act *involving* murder. However, in view of our conclusion that the evidence was insufficient to prove that Satterwhite was involved in the murder conspiracy, we need not decide whether the charge of conspiracy to murder was properly alleged as a predicate act.

that Satterwhite knew that the sheriff, or anyone in the Sheriff's Office, intended to murder an undercover informant who had committed a serious crime. Since the Government only proved that Satterwhite committed one predicate act, Satterwhite's conviction on the RICO count must be reversed.[33]

### C. *Cochran*

 Cochran contends that the evidence is insufficient to sustain his conviction on the Count III conspiracy charge. Specifically, Cochran notes that he retired as a deputy sheriff in May 1976—three years before any arrests were made in connection with the charges brought in this case, and that there was no evidence in the record that he had ever been to the Pat Smith place. In addition, although Cochran responded to a disturbance call at the Foster farm on one occasion, he claims that there is no evidence that he knew illegal gambling was going on at that location or that he was part of a conspiracy to facilitate illegal gambling.

Contrary to Cochran's allegations, there is substantial evidence to support his conspiracy conviction. There is a good deal of evidence that Cochran was aware of the existence of illegal gambling in Gregg County. In fact, Cochran admitted that it was "fairly common" knowledge that gambling occurred at the Foster farm. In addition, after he retired from the Sheriff's Office, on two occasions Cochran hosted barbecues at which some gambling occurred. Thereafter he "got word"—apparently from Welch—that it was not a good idea for him to be gambling at his place. Cochran told Texas Ranger Glenn Elliott that he did not understand how he could be "reprimanded for having played craps out at my place on two occasions when I had a barbecue and fish fry where there was as much gambling as apparently went on in the County." The evidence revealed that on one occasion, Deputies Ira Scott and Jim Montgomery responded to a disturbance call involving gunfire at the Foster farm. A gambling game was in progress there at that time. After the two deputies were dispatched to the game site, Cochran asked Welch whether he should handle the problem himself, and Welch agreed that Cochran should take care of the matter. Cochran arrived at the Foster farm shortly after Scott and Montgomery had apprehended two men, one of whom possessed a shotgun. Cochran dismissed the two deputies after telling them that he knew the people at the Foster farm were having a little game and that everything was alright. He then released the two men who had been detained. There was never an investigation or report on the shooting or the gambling that night. These facts—Cochran's admission that he knew of the gambling going on at the Foster farm, his consultation with Welch as to whether he should personally handle the disturbance at the Foster farm, and his failure to investigate, report, or close down the illegal gambling—provide sufficient evidence from which the jury could have concluded beyond a reasonable doubt that Cochran knew of the conspiracy and intentionally performed acts in furtherance of the conspiracy. His agreement to join the conspiracy can reasonably be inferred from these conclusions. We cannot say that a reasonable jury could not find the evidence inconsistent with all reasonable hypotheses of Cochran's innocence. Cochran's conviction on the Count III conspiracy, therefore, must be affirmed.

Cochran further contends that the evidence was insufficient to support his conviction on Count V. To support this contention, Cochran argues that the Government failed to prove that he committed two predicate acts of racketeering. The Government charged three predicate acts against Cochran, and proof of two of them would

---

**33.** Because we reverse Satterwhite's RICO conviction on the ground that the Government failed to prove that Satterwhite committed two predicate acts, we need not address Satterwhite's argument that the Government failed to prove an interrelationship between the alleged predicate acts. That argument, at any rate, has previously been considered and rejected by this Court. *Elliott*, 571 F.2d at 899 n.23.

support Cochran's conviction on the RICO charge.

### 1. Count III Conspiracy

■ The Count III conspiracy to obstruct the enforcement of the criminal laws of the State of Texas with intent to facilitate an illegal gambling business—Cantrell's game—was the first act of racketeering asserted against Cochran. We have already held above that the evidence was sufficient to sustain the jury verdict that Cochran was a participant in this conspiracy. That Cochran retired from the Sheriff's Office in May 1976, even though the conspiracy was alleged to have remained in existence until January 17, 1979, does not suggest that the conspiracy count was improperly alleged as a predicate act. As we have previously noted, *see* note 30 *supra*, an "association with" an enterprise is prohibited by the substantive RICO provision; the statute applies to outsiders as well as to insiders.

### 2. Conspiracy to Murder

■ As stated earlier, Captain Don Hale arranged with Sheriff Welch, in 1974, to utilize an informant to apprehend two suspected criminals (Makarski and Aldridge). Cochran was the go-between between Welch and Captain Hale (the informant's contact). The informant—Larry Burke—planned to commit a robbery at the Pines Motel in order to gain the confidence of Makarski and Aldridge. The incident at the Pines Motel ended when Burke killed one woman and severely wounded another. At trial, Hale testified that before Burke admitted to him that he had committed the murder, Hale met with Cochran and told Cochran that their undercover informant had been at the Pines Motel and that he matched the description of the murderer. Several days later, Burke called Hale and, with the approval of Sheriff Welch and Cochran, Hale met with Burke. According to Hale, Welch and Cochran directed him not to arrest the informant at their meeting, but instead simply to gather information. At that meeting, Burke admitted to

Hale that he had committed the murder at the Pines Motel. After the meeting Hale reported back to Welch and Cochran, revealing the identity of the informant and the fact that the informant had confessed.

Hale then testified that Sheriff Welch devised a plan whereby Hale was to set up a stakeout, lure the informant to the location by giving him information that, on a certain date, $60,000 in political contributions would be located in a safe there, and then kill the informant (and whoever might be with him) when he attempted to rob the safe. Hale testified as follows with respect to the plan:

A. The plan, as it seems, was to kill Mr. Burke when he attempted to rob the safe.

Q. All right. By himself?

A. We had no idea who would be with him. Perhaps Mr. Makarski and Mr. Aldridge.

Q. All right, sir. Did the Sheriff tell you why he wanted to kill Mr. Burke?

A. Well, to me it was explained that it would be easier to make him a hero in working with the Police Department than arresting him for murder.

Q. All right. Now, did he give you any directions with regard to how you were going to do this murder?

A. I was to pick the crew that I needed, and we would have a session or so practice, and the time to cover this area was designated on the weekend. We would cover it two nights, and the money would be picked up Sunday morning and taken back to the Sheriff's office for distribution, buying favors and what-have-you, so this gave us a time period.

Q. All right. Was the Sheriff alone when he told you about this?

A. No, sir, Jim Cochran was there.

Q. So during all this planning stage, Mr. Cochran was present?

A. Yes, sir, he sure was.

Hale further testified that he told the other deputies who were to help him carry out the

plan exactly what had been told to him—"that if the man entered the building he was not to leave." When Aldridge and Makarski arrived at the County Barn, they saw one of the deputies inside and, though the deputy fired at them, they were able to escape. A week or so after the stakeout at the County Barn, Cochran told Hale that Welch wanted Hale to resign.

Cochran alleges that the Government failed to prove that Cochran participated in devising the plan to kill the informant or that he wilfully became a member of the conspiracy. The evidence shows (1) that Hale told Cochran and Welch that the informant might have murdered someone; (2) that, with the approval of Sheriff Welch, Hale set up a meeting with the informant and that Cochran and Welch directed Hale not to arrest the informant at that time; (3) that Hale discovered that the informant actually had committed a murder and he relayed that information to Cochran and Welch; and (4) that Cochran was present when Welch directed Hale to set up the stakeout and kill the informant. In addition, the informant Larry Burke testified that at his murder trial, his attorney asked Cochran "how they intended to explain away [Burke's] death." According to Burke, "Mr. Cochran had said that they decided to tell my people that I had been killed in a burglary, rather than admit that I'd been involved in such a heinous crime as murder." This evidence is sufficient to support the conclusion that Cochran was a participant in the conspiracy to murder the informant. A reasonable jury could believe that this evidence excluded every other reasonable hypothesis than that of guilt. There is substantial evidence to support a conviction on the conspiracy charge.[34]

### 3. Bribery

■ Finally, Cochran argues that the Government failed to prove that Cochran exercised his discretion as a public servant to allow a private club to operate in an unlawful manner. Cochran contends that there was no evidence that any illegal activity was taking place at the club or the motel connected with the club. In addition, he contends that there was no evidence of any agreement that Cochran would allow the club or the motel to operate in an unlawful manner in return for money.

Jerry Don Stewart supervised the operation of the Patriot Motel, which consisted of a restaurant, a private club, and a motel complex. Stewart testified at trial that he gave Cochran $100 on approximately three occasions in 1973, and that Cochran accepted the money. According to his testimony, he hoped that by giving money to the Sheriff's Office, the club and motel that he was supervising would not be harassed. In addition, there was testimony that the club was not strict about staying open after closing hours and that Stewart planned to hire some prostitutes to work at the motel. Despite the lack of direct evidence of an agreement between Cochran and Stewart, the evidence is sufficient for a jury to conclude that Cochran intentionally accepted a pecuniary benefit as consideration for the exercise of his discretion as a public servant; i. e., as consideration for overlooking certain illegal activities occurring at the Patriot Club or Motel.

■ Like Welch, Cochran contends that the acts of bribery were actually only acts of official misconduct under Tex. Penal Code Ann. tit. 8, § 39.01(a)(1)–(4) (Vernon 1974). Offenses under this section are misdemeanors and cannot serve as predicate acts for a RICO conviction. Thus, Cochran argues that the district court erred in failing to dismiss from the indictment the predicate act alleging bribery. Cochran's argument is premised upon the rule of statutory construction that when a general statute is in conflict with a more detailed statute, the latter will control unless it appears that the

---

**34.** Although the Count III conspiracy and the conspiracy to murder together provide the pattern of racketeering activity necessary to support Cochran's Count V RICO conviction, inasmuch as we have not explicitly held that a conspiracy to murder can serve as a predicate crime for a RICO conviction, see notes 19, 32 supra, we will also examine the evidence supporting the third predicate act alleged against Cochran.

legislature intended to make the more general statute controlling. *See Ex Parte Harrell*, 542 S.W.2d 169 (Tex.Crim.App.1976). Cochran's argument cannot prevail. First, the allegations against Cochran—that he accepted money from Jerry Don Stewart as consideration for allowing the club at the Patriot Motel to operate in an unlawful manner—fall squarely within the provisions of the Texas bribery statute. *See Mahome v. State*, 542 S.W.2d 177 (Tex.Crim.App. 1976) (defendant's conviction for bribery under section 36.02(a)(1) affirmed when evidence showed that defendant offered a police officer money to prevent his arrest for driving while intoxicated). Second, even if this is a situation in which two statutes relating to the same subject matter must be harmonized, this Court finds no authority—and none has been offered by the defendant—that the official misconduct statute is more specific than the bribery statute. Indeed, it would appear that the bribery statute, which requires acceptance of a pecuniary benefit *as consideration for* the action by the recipient, is more specific than the official misconduct statute, which merely requires that the public servant act with intent to obtain a benefit for himself.

The bribery charge was properly included as a predicate act in Count V of the indictment and, since the Government proved Cochran's participation in two predicate crimes, the evidence is sufficient to sustain Cochran's RICO conviction.

### D. *Cashell*

■ Cashell contends that the evidence was insufficient to sustain his conviction on the Count IV conspiracy—conspiracy to obstruct the enforcement of the criminal laws of the State of Texas with intent to facilitate an illegal gambling business (the gambling at the fairgrounds). Cashell claims that the evidence shows nothing more than his presence at the fairgrounds. Although he received money at the close of the 1978 fair, he claims that there was no evidence that he had agreed to refuse to enforce the penal laws with respect to gambling. Moreover, Cashell argues that there was no evidence that he refused to accept a complaint from any person or that he took any other action to obstruct the enforcement of the criminal laws.

Although Cashell was not hired by the Jaycees to work as a security guard at the fair, he regularly patrolled the midway area of the fair—wearing his gun—every night of the 1978 fair. Harley Dilday, a Jaycees member who was in charge of security for the 1978 fair, testified that Deputy Roach (who secured personnel from the Sheriff's Office to maintain security on the fairgrounds) requested that the Jaycees keep the Longview City Police and others away from the midway area. On a number of occasions, Roach ordered deputies who were not authorized to patrol the midway to leave that area. Cashell (along with certain members of the Sheriff's Office and an investigator for the District Attorney's Office), however, was permitted to patrol the midway on a regular basis.

There was evidence introduced at trial that concession manager Schlar paid money to the men who patrolled the midway at the fair to prevent them from closing down the illegal games. Cashell himself received $300 after the 1978 fair. Frank Odom, an investigator for the District Attorney's Office in Gregg County, testified that he had been present when Cashell received gambling complaints and that Cashell had never directed him (or any law enforcement officer) to investigate the complaints or to shut down the illegal gambling games. At trial, FBI Agent Earl Starks testified that during a conversation he had with Cashell at the fair, Cashell told him that "a person would have much better odds of coming out ahead if he was to take a Thousand Dollars to go to Las Vegas and bet it there. He could come out ahead, even paying his expenses and coming back, over gambling there at the Fair." The evidence establishes that Cashell knew that illegal gambling occurred at the fair, that he patrolled the midway where gambling occurred and never took any action to close down the illegal games or to cause an investigation of the illegal games, and that he was paid money at the close of the 1978 fair. From Cashell's

knowledge and his intentional actions in furtherance of the conspiracy, the jury could reasonably infer that he agreed to join the conspiracy. There is sufficient evidence to support Cashell's conviction on Count IV.

Cashell also claims that the evidence was insufficient to convict him on the Count V RICO charge. In order to satisfy the requirements of the RICO charge, the Government was required to prove that Cashell engaged in two predicate acts of racketeering. The indictment charged Cashell with three acts of racketeering: (1) the Count IV conspiracy, (2) accepting a pecuniary benefit from Schlar as consideration for the exercise of his discretion as a public servant, and (3) accepting a pecuniary benefit as consideration for the exercise of his discretion as a public servant in obtaining driver's license information through the Sheriff's Office.

### 1. Count IV Conspiracy

We have already determined above that the evidence was sufficient to support Cashell's conviction on the Count IV conspiracy charge. That conspiracy, therefore, constitutes one predicate act of racketeering.

### 2. Bribery at the Fairgrounds

■ Cashell argues that his acceptance of money at the end of the 1978 fair did not constitute an act of bribery. Rather, he claims, if it was an offense at all, it was merely a misdemeanor—compensation for past official behavior under Tex. Penal Code Ann. tit. 8, § 36.07 (Vernon Supp. 1980). Section 36.07(b) states:

> A public servant commits an offense if he intentionally or knowingly solicits, accepts, or agrees to accept any pecuniary benefit for having exercised his official powers or performed his official duties in favor of another.

As a misdemeanor, this could not serve as a predicate offense for a substantive RICO count. The Practice Commentary following the statute states:

> This offense is a lesser included offense of bribery since the accused may be suspected of bribery but the state unable to prove that there was any direct relationship between anticipation of compensation and the official action.... On the other hand, assuming that the official action has not been influenced in advance by promise of gain, the consequence of a violation of this section is less serious than the harm of bribery and the misdemeanor penalty is therefore appropriate.

Cashell contends that since there was no prior agreement between Cashell and Schlar that Schlar would pay Cashell money, Cashell could not have violated the bribery statute.

Admittedly, the evidence indicates that none of the men patrolling the midway knew exactly how much money they would receive at the close of the fair. Schlar testified that he did not make a specific agreement with Cashell as to the *amount* of money that Schlar would pay Cashell after the fair. The evidence also shows, however, that although there was no agreement specifying the amount of money that would be paid, the men who patrolled the midway knew that they would receive some amount of money at the end of the fair. Thus, it appears that there was a direct relationship between Cashell's anticipation of compensation and his official action. The circumstances surrounding the payment from Schlar to Cashell evidence the more serious violation contemplated by the Texas bribery statute. The Government properly alleged a bribery count (which, as a felony, can serve as a predicate crime) rather than compensation for past official behavior, a misdemeanor.

Cashell argues that if the Government properly alleged a charge of bribery, then the evidence was insufficient to prove that Cashell exercised his discretion as a public servant in allowing illegal gambling at the fairgrounds. To support this contention, Cashell claims that while he was patrolling at the fairgrounds, he had no authority to shut down the games, to accept a complaint (unless the justice of the peace in whose jurisdiction the case was filed was unavailable), or to arrest the gamblers.

The Texas Code of Criminal Procedure provides that a justice of the peace "is a magistrate within the meaning of this Code." Tex.Code Crim.Pro.Ann. art. 2.09 (Vernon 1977). The general duties of a magistrate are

> to preserve the peace within his jurisdiction by the use of all lawful means; to issue all process intended to aid in preventing and suppressing crime; to cause the arrest of offenders by the use of lawful means in order that they may be brought to punishment.

*Id.* art. 2.10. More specifically, a magistrate has a duty to prevent offenses under certain circumstances. Tex.Code Crim.Pro. Ann. art. 6.03 (Vernon Supp.1980) states:

> Whenever, in the presence or within the observation of a magistrate, an attempt is made by one person to inflict an injury upon himself or to the person or property of another, including the person or property of his spouse, it is his duty to use all lawful means to prevent the injury. This may be done, either by verbal order to a peace officer to interfere and prevent the injury, or by the issuance of an order of arrest against the offender, or by arresting the offender; for which purpose he may call upon all persons present to assist in making the arrest.

It is clear that a magistrate who observed illegal gambling at a place within his jurisdiction would have a duty to take some action to stop the gambling.

Cashell admits that a magistrate has a duty to "cause the arrest of offenders by the use of lawful means in order that they may be brought to punishment." However, Cashell contends that he was not acting as a magistrate when he was patrolling the midway at the fair. Generally, the jurisdiction of a justice of the peace is circumscribed by the limits of his precinct. When a justice of the peace is acting as a magistrate, his judicial authority is coextensive with his county. *Ex parte Clear*, 573 S.W.2d 224, 228 (Tex.Crim.App.1978) (en banc). The fair was located within Gregg County, but outside Cashell's precinct. If Cashell was not acting as a magistrate at the fair, it would appear that he would not be guilty of bribery since, while outside his jurisdiction, he had no authority to exercise official powers or to perform official duties as a public servant.

Cashell correctly maintains that a justice of the peace is a magistrate when he sits for the purpose of inquiring into a criminal accusation against any person. It is true that when a justice of the peace holds an examining trial he sits as a magistrate. Yet there is no evidence that this is the only circumstance under which a justice of the peace acts as a magistrate. The Code of Criminal Procedure explicitly states that a justice of the peace is a magistrate within the meaning of the Code. The statutory language compels this Court to conclude that Cashell had the authority—and the duty—of a magistrate when he viewed illegal gambling taking place at the fairgrounds.

Finally, Cashell argues that the Government should have been compelled to elect between the predicate acts of the fairground conspiracy and the acceptance of the bribe since both acts arose out of the same transaction. Cashell argues that Congress did not contemplate, when it passed the RICO statute, that a defendant could be convicted of a substantive RICO offense on the basis of two predicate acts arising out of a single transaction. The offenses alleged as predicate acts were separate acts and were properly alleged in the indictment and proved at trial as two separate predicate acts. Cashell's contention that the district court should have required the Government to elect between the two counts is without merit. Also without merit is Cashell's argument that the predicate offenses charged against him constitute only sporadic activity that was not intended to be covered by a substantive RICO charge.

Inasmuch as the Government proved Cashell's participation in two acts of racketeering—the Count IV conspiracy and the bribery at the fairgrounds—we need not address his arguments with respect to the third predicate offense involving the

sale of driver's license information.[35] Cashell's conviction on the Count V RICO charge must be affirmed.

### IV. *Conclusion*

Satterwhite's conviction on the Count V RICO charge is REVERSED. The convictions of Cochran, Welch, and Cashell on the Count V RICO charge are AFFIRMED. The convictions of Cochran, Satterwhite, and Welch on the Count III conspiracy are AFFIRMED. The convictions of Welch and Cashell on the Count IV conspiracy are AFFIRMED.

---

**35.** One argument raised by Cashell is that predicate act P—accepting a pecuniary benefit as consideration for the exercise of his discretion as a public servant in obtaining driver's license information through the Sheriff's Office—did not constitute the offense of bribery under state law. Cashell maintains that if this conduct was an offense at all, it was only an act of official misconduct, Tex. Penal Code Ann. tit. 8, § 39.01 (Vernon 1974), and not an act of bribery, *id.* § 36.02 (Vernon Supp.1980). Even if this contention is true—which we need not decide—Cashell does not argue that prejudice arose from the inclusion of this charge in the indictment or from the evidence introduced to support this charge at trial. Thus, any possible error in the inclusion of this offense would not require a reversal of Cashell's conviction.